Valorie W. DAVENPORT

v.

The Honorable Carolyn GARCIA.

No. D–1558.

Supreme Court of Texas.

June 17, 1992.

Rehearing Overruled Sept. 9, 1992.

Valorie W. Davenport, Houston, for appellant.

Marty R. Akins, B. Lee Ware, Russell B. Serafin, Tom L. Pettiette, Houston, for appellee.

## OPINION

DOGGETT, Justice.

In this mandamus proceeding, we address three issues: (1) the ability of a judge to suppress speech with a "gag order;" (2) whether Relator was impermissibly denied access to court records; and (3) the appropriate standard for removal of a guardian ad litem. Applying our state constitutional

guarantee of free expression to invalidate the trial court's unconstitutional prior restraint on speech, we grant this part of the petition for writ of mandamus. Because the trial court did not otherwise abuse its discretion, the remainder of the petition is denied.

A guardian ad litem was appointed to represent two hundred and thirteen children among numerous persons who brought suit concerning toxic chemical exposure at the Brio Dump site in Harris County. In a 1987 settlement the adults released all claims to future medical benefits for their children, and in 1989 the ad litem withdrew. In February 1990 Judge Alice Trevathan, then the presiding judge, appointed Valorie Davenport, Relator herein, as guardian ad litem.

After eighteen months of work, Davenport submitted a bill for her services on August 21, 1991. At a hearing two days later, Judge Carolyn Garcia, who had become the presiding trial judge, on her own motion, questioned the continued need for a guardian ad litem. Additionally, the court entered an oral injunction, described as a "gag order," instructing the ad litem, parties and counsel to "cease and desist any discussion of this case outside the court hearing" and prohibiting any "communications with any other lawyer or discussion at all about the matters that have transpired in this case."

On September 10 the trial court dismissed Davenport, concluding that because the parents were no longer seeking either individual recovery or expense reimbursement, no conflict of interest existed to justify continuation of the ad litem. The court also found unnecessary ad litem oversight of a medical monitoring program proposed by defendants as part of a settlement. While noting that the parents' counsel had "competently handled [this] litigation" in "secur[ing] a generous settlement proposal for the minor children," Judge Garcia did not specify any change in circumstances following Judge Trevathan's appointment of Davenport. The next day, again on its own motion, the court entered a protective order requiring that:

1. Counsel in this case, present and former, are expressly ORDERED to refrain from discussing or publishing in writing or otherwise, any matters of this case with any persons other than their clients, agents, or employees in the necessary course of business in this case.

2. Counsel is ORDERED to refrain from any public comment, casual or otherwise concerning the facts of this case or the conduct of counsel in this case other than in a court hearing.

3. Counsel is ORDERED to inform their clients, witnesses, agents and representatives that this ORDER extends to each of them and is subject to a finding of contempt by this court from disobedience, direct or indirect comment intended to violate this ORDER. Counsel was and is directed to communicate with their clients only, and advise each that they are directed to refrain from discussing the case except with counsel.

### I. The Gag Order

The trial court correctly characterized as a "gag order" its oral injunction of August 23, which prohibited all discussion of the Brio case outside the courtroom. Personally informed by the judge that she was "relieved of responsibility," and that she had "been ordered by the Court not to discuss the case with anyone," Relator risked contempt should she speak either in public or even in private to any of the children whose interests she had represented. Nor did the order permit any party to discuss the case or the pending settlement with a family physician, medical expert, or another attorney.

These limitations were reiterated in the written protective order of September 12, which prohibited *any* public comment or discussion of the litigation with anyone not involved in the "necessary course of business of this case." Counsel were also directed to inform their clients of the order's applicability to each of them. The sole reason given for this sweeping injunction was the finding that "conflicts between counsel and the parents of the minor children were resulting in miscommunications

with the parents of the children and with the media and general public."

We consider whether the court's gag orders violate the guarantee of free expression contained in article I, section 8 of the Texas Constitution, which provides in pertinent part:

> Every person shall be at liberty to speak, write or publish his opinions on any subject, being responsible for the abuse of that privilege....

The history of this provision is a rich one, and its language demonstrates Texas' strong and longstanding commitment to free speech. By the plain language of our constitution, this fundamental liberty "shall forever remain inviolate." Tex. Const. art. I, § 29.

From the outset of this state's history, freedom of expression was a priority. As rural communities developed from the wilderness in the young region, Mexico passed the Constitutive Act of 1824, uniting Coahuila and Texas into one Mexican state. Already integrated into the government and with nine times the population of Texas, Coahuila predominated. After unsuccessful efforts to have the new state government forward their written complaints or remonstrances to the central government,[1] dissatisfied Texans sought in 1833 a Mexican state constitution separate from Coahuila. This first proposed constitution incorporated the strong desire of Texans to speak without fear of governmental repression:

> The free communication of thoughts and opinions, is one of the inviolable rights of man; and every person may freely speak, write, print, and publish, on any subject, being responsible for the abuse of that liberty.

*Proposed Constitution for the State of Texas* (1833) art. 16, *reprinted in Documents of Texas History*, at 80 (Ernest Wallace ed. 1963). As an early advocate of a strong state constitution,[2] Stephen F. Austin was jailed for his outspokenness in personally carrying this proposed charter and other remonstrances to Mexico City.[3] The authoritarianism and unresponsiveness of Mexico to these attempts to exercise and establish protection of free speech were a contributing factor to Texas' revolution and independence.[4]

Although the 1836 Texas Independence Constitution in general closely tracked the wording of the United States Constitution, different language was chosen to protect speech:

> Every citizen shall be at liberty to speak, write, or publish his opinions on any subject, being responsible for the abuse of that privilege. No law shall ever be passed to curtail the liberty of speech or of the press; and in all prosecutions for libels, the truth may be given in evidence, and the jury shall have the right to determine the law and fact, under the direction of the court.

Constitution of the Republic of Texas, Declaration of Rights § 4 (1836).[5] Rather than

---

1. The constitution now explicitly protects Texans' "right, in a peaceable manner, to assemble together for their common good; and apply to those invested with the powers of government for redress of grievances or other purposes, by petition, address or remonstrance." Tex. Const. art. I, § 27.

2. Joseph W. McKnight, *Stephen Austin's Legalistic Concerns*, 89 Sw.Hist.Q. 239, 246–47, 263–64 (1986).

3. Eugene C. Barker, *Stephen F. Austin, in The Handbook of Texas* 84 (Walter Prescott Webb ed. 1952); Robert E. Hall, *Remonstrance—Citizen's Weapon Against Government's Indifference*, 68 Tex.L.Rev. 1409, 1417, 1421 (1990) (hereinafter Hall, *Remonstrance*).

4. *See* Hall, *Remonstrance,* at 1412–21; Robert A. Calvert and Arnoldo De Leon, *The History of*

*Texas* 56–58 (1990); John Sayles, *Introduction to Texas Constitutions* 129–35 (4th ed. 1893); T.R. Fehrenbach, *Fire and Blood: A History of Mexico* 378–379 (1973); Arvel Ponton III, *Sources of Liberty in the Texas Bill of Rights,* 20 St. Mary's L.J. 93, 100 (1988) (hereinafter Ponton, *Sources of Liberty* ).

5. Lorenzo de Zavala had ample reason to be concerned with freedom of expression at the time of his drafting substantial portions of the 1836 Constitution. He was in hiding from a wide-scale manhunt ordered by Santa Anna because of his letters and speeches criticizing the Mexican government. Raymond Estep, *Lorenzo de Zavala and the Texas Revolution,* 57 Sw. Hist.Q. 322 (1954). *See also* Calvert & De Leon at 65.

a restriction on governmental interference with speech such as that provided by the First Amendment of the United State Constitution, Texans chose from the beginning to assure the liberties for which they were struggling with a specific guarantee of an affirmative right to speak. This language of the Texas Independence Constitution became the model for all of our subsequent state constitutions.

At the 1845 constitutional convention, after renewed deliberation concerning the terms of the free speech provision,[6] the 1836 language was kept largely intact.[7] What had been the Declaration of Rights was, as otherwise revised, renamed the Bill of Rights and moved to a place of overriding prominence, at the outset of the Constitution. The next three constitutions in 1861, 1866, and 1869 retained this language amidst intense public debate over secession[8] and reconstruction.

The drafters of the 1876 Constitution began their convention with a heightened sensitivity of the need for a strong state constitution.[9] While major changes in the Bill of Rights were not initially anticipated,[10] vigorous debate ensued.[11] Delegate McLean's efforts to tie freedom of speech to "good motives" in the libel section was

disapproved.[12] Additionally, a proposal to replace the existing free expression provision with alternative language more similar to that of the First Amendment of the United States Constitution was explicitly rejected.[13] By substituting the word "person" for the prior "citizen" in the current language of article one, section eight, "[e]very person shall be at liberty to speak, write, or publish his opinions on any subject," the delegates removed any citizenship requirement. *Compare* Tex. Const. of 1845, art. I, §§ 5–6. In their careful attention to its language, Texans once again chose protection in article one, section eight that is highly distinct from the First Amendment. Continued inclusion of an expansive freedom of expression clause and rejection of more narrow protections indicates a desire in Texas to ensure broad liberty of speech.

Consistent with this history, we have recognized that in some aspects our free speech provision is broader than the First Amendment. *O'Quinn v. State Bar of Texas*, 763 S.W.2d 397, 402 (Tex.1988) (noting that "'Texas' free speech right [has been characterized]" as being broader than its federal equivalent," the court concluded that "it is quite obvious that the Texas

6. The decision of the delegates to replace the 1836 language with the free speech provision of the Tennessee Constitution was later reversed. *Journals of the Convention* 74–75 (1845), *reprinted in Journals of the Convention* (Shoal Creek Publishers 1974).

7. Not even conventional limits on free speech curbed the sweeping scope of the free speech guarantee; the delegates defeated a provision to deem libelous speech injurious to female reputation, without inquiry into its truth. Ponton, *Sources of Liberty*, at 106 n. 102, quoting *Debates of the 1845 Constitutional Convention* 94 (1846).

8. As the break with the Union loomed, Governor Sam Houston and others argued for independence rather than alliance with the Confederacy. Mark E. Nackman, *A Nation Within A Nation: The Rise of Texas Nationalism* 127–31 (1975).

9. *See infra,* text accompanying notes 38–41.

10. *The Convention and its Work*, Galveston Daily News, Aug. 24, 1875 at 1, col. 2. ("to agree

upon ... the Bill of Rights, ought not to be difficult. There is nothing new in the fundamental province of reason and conscience and justice."). This newspaper's reports of the 1875 convention are significant not only as the report of the leading paper in one of the state's first major cities, but also because it printed bulk copies of the constitution and the official journal of the convention.

11. The first report of the Bill of Rights committee "[found] the members discordant." *Second Dispatch*, Galveston Daily News, Sept. 15, 1875 at 1, col. 4.

12. *Constitutional Convention, Forty–Third Day*, Galveston Daily News, Oct. 23, 1875 at 1, col. 3.

13. *See Journal of the Constitutional Convention* 62 (1875) (proposal of Delegate Brady). Like the First Amendment, this proposal was framed purely as a negative restriction on enactment of laws restraining speech. Along with other proposals, it was rejected in favor of including an affirmative grant of the liberty to speak and publish. *See* Galveston Daily News, Oct. 13, 1875 at 1, col. 3 (recording the rejection of an

Constitution's affirmative grant of free speech is more broadly worded than the first amendment"); *Channel 4, KGBT v. Briggs,* 759 S.W.2d 939, 944 (Tex.1988) (Gonzalez, J., concurring) (the state provision is "more expansive than the United States Bill of Rights"). *See also Casso v. Brand,* 776 S.W.2d 551, 556 (Tex.1989) ("our state free speech guarantee may be broader than the corresponding federal guarantee").

Under our broader guarantee, it has been and remains the preference of this court to sanction a speaker after, rather than before, the speech occurs. This comports with article one, section eight of the Texas Constitution, which both grants an affirmative right to "speak ... on any subject," but also holds the speaker "responsible for the abuse of that privilege." The presumption in all cases under section eight is that pre-speech sanctions or "prior restraints" are unconstitutional. *Ex Parte Price,* 741 S.W.2d 366, 369 (Tex.1987) (Gonzalez, J., concurring) ("Prior restraints ... are subject to judicial scrutiny with a heavy presumption against their constitutional validity."); *Amalgamated Meat Cutters v. Carl's Meat and Provision Co.,* 475 S.W.2d 300 (Tex.Civ.App.—Beaumont 1971, writ dism'd).[14]

In *Ex Parte Tucker,* 110 Tex. 335, 220 S.W. 75 (1920), this court applied section eight to safeguard speech which may not otherwise have been guaranteed under the First Amendment as interpreted in that era. That case involved an injunction prohibiting union members from "vilifying, abusing, or using ... epithets" against the employees of a particular company. While such "fighting words" may not have been federally protected,[15] the court relied upon our own constitution:

The purpose of [article one, section eight] is to preserve what we call "liberty of speech" and "the freedom of the press," and at the same time hold all persons accountable to the law for the misuse of that liberty or freedom. Responsibility for the abuse of the privilege is as fully emphasized by its language as that the privilege itself shall be free from all species of restraint. But the abuse of the privilege ... shall be dealt with in no other way. It is not to be remedied by denial of the right to speak, but only by appropriate penalties for what is wrongfully spoken. Punishment for the abuse of the right, not prevention of its exercise, is what the provision contemplates.

220 S.W. at 76. In two early prior restraint cases, the Court of Criminal Appeals also relied on the state constitution to void injunctions prohibiting publication of trial testimony. *Ex Parte McCormick,* 129 Tex.Cr.R. 457, 88 S.W.2d 104 (App.1935) (orig. proceeding); *Ex Parte Foster,* 44 Tex.Cr.R. 423, 71 S.W. 593 (App.1903).

This court previously indicated that a prior restraint would be permissible only when essential to the avoidance of an impending danger. *Hajek v. Bill Mowbray Motors, Inc.,* 647 S.W.2d 253, 255 (Tex. 1983) (striking down an injunction because the language at issue "evoked no threat of danger to anyone and, therefore, may not be subject to the prior restraint of a temporary injunction."). *See also Dallas General Drivers, Warehousemen and Helpers v. Wamix, Inc. of Dallas,* 156 Tex. 408, 295 S.W.2d 873, 879 (1956); *Ex Parte Tucker,* 220 S.W. at 76 (speech is properly restrained only when involving an actionable and immediate threat); *Pirmantgen v. Feminelli,* 745 S.W.2d 576, 579 (Tex.App.— Corpus Christi 1988, no writ) (restriction

alternative free speech provision in favor of the language of the 1845 Constitution).

**14.** This condemnation of prior restraints is understandable:

Prior restraints fall on speech with a brutality and a finality all their own.... [T]he violator of a statute punishing speech criminally knows that he will go before a jury, and may be willing to take his chance, counting on a

possible acquittal. A prior restraint, therefore, stops more speech more effectively. A criminal statute chills, prior restraint freezes. Alexander M. Bickel, *The Morality of Consent* 61 (1975).

**15.** *See, e.g., Chaplinsky v. New Hampshire,* 315 U.S. 568, 569, 62 S.Ct. 766, 768, 86 L.Ed. 1031 (1942) (upholding conviction of a Jehovah's Witness for calling a city marshal a "damned fascist" and a "racketeer").

against disseminating an allegedly libelous letter was an unconstitutional prior restraint).

■ Since the dimensions of our constitutionally guaranteed liberties are continually evolving, today we build on our prior decisions by affirming that a prior restraint on expression is presumptively unconstitutional. With this concept in mind, we adopt the following test: a gag order in civil judicial proceedings will withstand constitutional scrutiny only where there are specific findings supported by evidence that (1) an imminent and irreparable harm to the judicial process will deprive litigants of a just resolution of their dispute, and (2) the judicial action represents the least restrictive means to prevent that harm. Assisting our analysis are federal cases that have addressed prior restraints. The standard enunciated in *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 563–64, 96 S.Ct. 2791, 2804–05, 49 L.Ed.2d 683 (1976), does not, however, sufficiently protect the rights of free expression that we believe that the fundamental law of our state secures. Today we adopt a test recognizing that article one, section eight of the Texas Constitution provides greater rights of free expression than its federal equivalent.[16]

We are fully aware that a prior restraint will withstand scrutiny under this test only under the most extraordinary circumstances. That result is consistent with the mandate of our constitution recognizing our broad right to freedom of expression in Texas. An individual's rights under the state constitution do not end at the courthouse door; rather, the courthouse is properly the fortress of those rights.

The first requirement of our standard advances from the prior holdings of Texas courts that only an imminent, severe harm can justify prior restraint, and in the context of gag orders, that harm must be to the judicial process. *Ex Parte McCormick*, 88 S.W.2d 104; *Ex Parte Foster*, 71 S.W. at 595. The mandate that findings of irreparable harm be made is based on our state constitutional preference for post-speech remedies. Only when no such meaningful remedies exist will prior restraints be tolerated in this context.

The second part of the test is intended to ensure that no alternative exists to treat the specific threat to the judicial process which would be less restrictive of state speech rights. While this element is shared in common with the ruling in *Nebraska Press*, 427 U.S. at 563–64, 96 S.Ct. at 2804–05,[17] we view the federal test an-

---

**16.** Concerned that public prejudice could prevent impanelling of a jury, a trial judge issued an order restraining the news media from publishing any information about a murder suspect in *Nebraska Press Ass'n v. Stuart*, 427 U.S. at 542–43, 96 S.Ct. at 2794–95. The United States Supreme Court invalidated the order as an unconstitutional prior restraint, noting that: (1) the underlying basis was too speculative; (2) less restrictive alternatives were not investigated; (3) no evidence was presented that the prior restraint would have in fact achieved its purpose; and (4) the order was overbroad. *Id.* at 562–69, 96 S.Ct. at 2804–08. These conclusions are quite fact specific, *id.* at 569, 96 S.Ct. at 2807, and thus only serve to reinforce a presumption that prior restraints, including those directed at media publication, are unconstitutional.

In *Bernard v. Gulf Oil Co.*, 619 F.2d 459 (5th Cir.1980), the federal authority upon which the concurrence rests almost its entire analysis, the trial judge prohibited the plaintiffs and their attorneys in a class action from communicating with any potential class members without court

approval. The Fifth Circuit held that, in the context of Rule 23(d) of the Federal Rules of Civil Procedure, the order was violative of the First Amendment. *Id.* at 475–78.

The majority recognized that as to the first prong of its test, "[a]t least three [Supreme Court] justices may have rejected even that standard as overly lenient." *Id.* at 473. A concurrence characterized the "majority's first amendment analysis [as a] needless excursion into a difficult and little-explored area of constitutional law." *Id.* at 481 (Tjoflat, J., concurring). If anything, the admittedly unsettled nature of the federal law reflected in these writings supports development of an independent standard under the Texas Constitution. *See also infra*, text accompanying notes 59–63.

**17.** The only other factors to be considered under *Nebraska Press* are the extent of pretrial news coverage and the effectiveness of the restraining order. We note that to the extent that this opinion cites any federal law, such precedent is used only for guidance, and in no way necessitates the result reached by this court today.

nounced therein [18] as too permissive toward prior restraints and decline to adopt it.[19] The federal approach offers only limited guidance concerning gag orders such as that involved here, which restrict access to information by prohibiting individuals from discussing a case.[20] Such orders should be treated like any other prior restraint.

■ Applying this test to the facts of this case, there can be no doubt but that the gag orders violated article one, section eight of the Texas Constitution. The orders fail to identify any miscommunication that the trial court may have perceived, does not indicate any specific, imminent harm to the litigation, and offers no explanation of why such harm could not be sufficiently cured by remedial action. For instance, had any miscommunication stemmed from improper statements by Relator, as implied by the court, the proper response may have been to sanction her conduct. By stopping not only the purported miscommunications but *any* communications, the broadly worded injunction certainly fails the second part of our test.

While a gag order may be expeditious in producing a settlement, decisions to terminate litigation based on lack of information can facilitate injustice. Additionally, "the argument of convenience can have no weight as against those safeguards of the constitution which were intended by our fathers for the preservation of the rights and liberties of the citizen." *Ex Parte McCormick*, 88 S.W.2d at 107. These liberties are central to the Texas Constitution. We have before announced:

> Let it at once be admitted that courts may arrogate the authority of deciding what the individual may say and may not say, what he may write and may not write, and by an injunction writ require him to adapt the expression of his sentiments to only what some judge may deem fitting and proper, and there may be readily brought about the very condition against which the constitutional guaranty was intended as a permanent protection. *Liberty of speech will end where such control begins.*

*Ex Parte Tucker*, 220 S.W. at 76 (emphasis added). We conclude today, as we did over seventy years ago, that the judicially imposed gag orders in question are void.

## II. The Role of the State Constitution

■ Having found that the trial court's gag orders violate article I, section 8 of the Texas Constitution, this court need not consider whether the United States Constitution has also been violated. Today we reaffirm our prior pronouncement that "[o]ur constitution has independent vitality, and this court has the power and duty to protect the additional state guaranteed rights of all Texans." *LeCroy v. Hanlon*, 713 S.W.2d 335, 339 (Tex.1986). We decline to

---

**18.** That standard has been largely developed in the context of criminal rather than civil proceedings, weighing the press' First Amendment rights against an accused's Sixth Amendment right to a fair trial. *See* Sheryl A. Bjork, Comment, *Indirect Gag Orders and the Doctrine of Prior Restraint*, 44 U. Miami L.Rev. 165, 166 (1989). For instance, the first element in this test, the extent of pretrial news coverage, usually has little bearing on a civil proceeding.

**19.** *Nebraska Press*, a splintered decision with five separate opinions, has been appropriately criticized for failing to provide a comprehensive guarantee of free expression. *See* Stephen R. Barnett, *The Puzzle of Prior Restraint*, 29 Stan. L.Rev. 539, 541 (1977); Benno C. Schmidt, Jr., *Nebraska Press Association: An Expansion of Freedom and Contraction of Theory*, 29 Stan. L.Rev. 431, 461 (1977). Nor are we the first state to recognize the inadequacy of the federal approach. *See State v. Coe*, 101 Wash.2d 364,

679 P.2d 353, 358–59 (1984). *See also infra*, note 32.

**20.** Neither *Nebraska Press* nor any other ruling of the United States Supreme Court has specifically considered such an order. Indeed, there is a confusing split of federal authority on this matter. *See In re Dow Jones*, 842 F.2d 603, 608–10 (2d.Cir.), *cert. denied, sub nom. Dow Jones & Co., Inc. v. Simon*, 488 U.S. 946, 109 S.Ct. 377, 102 L.Ed.2d 365 (1988) (gag orders on trial participants are subject to a lesser degree of scrutiny than are prior restraints); *In re Russell*, 726 F.2d 1007, 1010 (4th Cir.1984) (relying on *Nebraska Press* to uphold a gag order on trial participants); *but see Journal Publishing Co. v. Mechem*, 801 F.2d 1233, 1236 (10th Cir.1986) (gag orders on trial participants constitute prior restraint). The end result has been an increase in the number of gag orders on parties to ongoing litigation. Bjork, *Indirect Gag Orders*, at 174 & n. 71.

limit the liberties of Texans to those found in the Federal Constitution when this court is responsible for the preservation of Texas' own fundamental charter. When a state court interprets the constitution of its state merely as a restatement of the Federal Constitution, it both insults the dignity of the state charter and denies citizens the fullest protection of their rights.

### A.

Over the past twenty years, state courts have increasingly looked to their own constitutions, rather than the Federal Constitution, in examining the extent of their citizens' liberties.[21] This trend toward what has variously been called "state constitutionalism" and "new federalism" has met with broad approval.[22] Numerous commentators and courts, both state and federal, have advocated and applied a method of constitutional analysis wherein the state court may examine its own constitution first to determine whether the right in question is protected.[23] Within the context of such an analysis, a state court can bene-

---

21. From 1970 to 1989, approximately six hundred published opinions relied on state constitutional grounds to provide protections broader than federally interpreted guarantees under the United States Constitution. Linda B. Matarese, *Other Voices: The Role of Justices Durham, Kaye and Abrahamson in Shaping the "New Judicial Federalism"*, 2 Emerging Issues in St. Const.L. 239, 246 (1989).

22. *See* Peter J. Galie, *State Supreme Courts, Judicial Federalism and the Other Constitutions*, 71 Judicature 100, 100 n. 10 (1987) (of approximately three hundred articles, "all but a handful are favorable."); Judith S. Kaye, *A Midpoint Perspective on Directions in State Constitutional Law*, 1 Emerging Issues in St. Const.L. 17, 17 (1988).

Many of the articles listed by the concurrence as opposed to this method in fact support judicial reliance on state constitutions. *See, e.g.*, Robert F. Utter, *Swimming in the Jaws of the Crocodile: State Court Comment on Federal Constitutional Issues when Disposing of Cases on State Constitutional Grounds*, 63 Tex.L.Rev. 1025, 1050 (1985) (hereinafter Utter, *State Court Comment*) (while noting the usefulness of "comment" on federal law, concluding that "a state supreme court should ... embark upon the interpretation of its own constitution, relying on it to protect the rights of its citizens"); Donald E. Wilkes, Jr., *First Things Last: Amendomania and State Bills of Rights*, 54 Miss. L.Rev. 233, 257 (1984) (describing as "alarming" the attempt "to curtail state court protection of individual rights"); Robert F. Williams, *State Constitutional Law Process*, 24 Wm. & Mary L.Rev. 169, 190 (1983) (urging state courts "to develop truly independent state constitutional jurisprudence"); *Developments in the Law—The Interpretation of State Constitutional Rights*, 95 Harv.L.Rev. 1324, 1498 (1982) ("It is vital that the [United States] Supreme Court's interpretation of the federal Constitution control federal constitutional law; it is not only unnecessary but also irrational that it control state law as well."); Ronald K.L. Collins, Commentary, *Reliance on State Constitutions—Away from a Reactionary Approach*, 9 Hastings Const. L.Q. 1, 2 (1981) (the "rediscovery of state constitutions is

certainly a good omen for a nation conceived in federalism"); Martha Craig Daughtrey, *State Court Activism and Other Symptoms of the New Federalism*, 45 Tenn.L.Rev. 731, 736 (1978) (praising the "growing number of high state courts" that have accorded broader protections than are available under the federal Constitution). *See also infra*, notes 33 & 36.

23. *See, e.g., City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 293, 102 S.Ct. 1070, 1076, 71 L.Ed.2d 152 (1982) (acknowledging that the Texas Constitution could provide broader protections than federal Constitution); *Carreras v. City of Anaheim*, 768 F.2d 1039, 1042–43 (9th Cir. 1985) (finding a restraining order overbroad under the California Constitution). *Farmers New World Life Ins. Co. v. Bountiful City*, 803 P.2d 1241 (Utah 1990) (looking to federal law only after finding no inverse condemnation under the state constitution); *Mountain States Tel. & Tel. Co. v. Arizona Corp. Comm'n*, 160 Ariz. 350, 773 P.2d 455, 461 (1989); *In re T.W.*, 551 So.2d 1186, 1190 (Fla.1989); *O'Neill v. Oakgrove Constr.*, 71 N.Y.2d 521, 528 N.Y.S.2d 1, 6, 523 N.E.2d 277, 282 (1988) (Kaye, J., concurring); *State v. Jewett*, 146 Vt. 221, 500 A.2d 233, 238 (1985) (federal law considered but required briefing of the state constitutional issue before the case could be decided); *State v. Koppel*, 127 N.H. 286, 499 A.2d 977, 979 (1985); *State v. Beno*, 116 Wis.2d 122, 341 N.W.2d 668 (1984) (following the state constitution even though recognizing the existence of a closely corresponding federal speech and debate clause found in U.S. Const. Art. 1, § 6, cl. 1); *People v. Rolfingsmeyer*, 101 Ill.2d 137, 77 Ill.Dec. 787, 790–92, 461 N.E.2d 410, 413–15 (1984) (Simon, J., concurring); *State v. Hunt*, 91 N.J. 338, 450 A.2d 952, 959 (1982) (Pashman, J., concurring); *Ravin v. State*, 537 P.2d 494, 513–15 (Alaska 1975) (Boochever, J., concurring); *Burrows v. Superior Court of San Bernardino County*, 13 Cal.3d 238, 118 Cal.Rptr. 166, 529 P.2d 590 (1975); *Freedman v. New Jersey State Police*, 135 N.J.Super. 297, 343 A.2d 148, 150 (1975); William J. Brennan, Jr., *The Bill of Rights and the States: The Revival of State Constitutions as Guardians of Individual Rights*, 61 N.Y.U.L.Rev. 535 (1986) (hereinafter Brennan, *Revival of*

fit from the insights of well-reasoned and developed federal jurisprudence, but is not compelled to reach identical results.

Our courts recognized the importance of our state constitution long before "new federalism" even had a name. A century-long line of Texas cases support applying our state's constitution,[24] particularly in the area of free speech. Our decision in 1920 to rely on the plain language of article I, section 8 in striking down a prior restraint in *Ex Parte Tucker*, 220 S.W. at 76, predated the application of the First Amendment to the states. *See Ex Parte Price*, 741 S.W.2d 366, 369 (Tex.1987) (Gonzalez, J., concurring).[25]

In *Traveler's Insurance Co. v. Marshall*, 124 Tex. 45, 76 S.W.2d 1007, 1010 (1934), this court struck down a state statute solely under the Texas Constitution, dismissing relevant caselaw interpreting a similar federal constitutional provision regarding the state's police power because "it can have no application to the Constitution of Texas." The court explained that "[i]t is quite

obvious the same rule of interpretation cannot be applied to the contract clause in our State Constitution...." *Id.*, 76 S.W.2d at 1011.

In *Sax v. Votteler*, 648 S.W.2d 661 (Tex. 1983), we invalidated a statute of limitations under the Texas Constitution's open courts provision. While expressly recognizing that the appeal was brought under both federal and state law, *id.* at 663, the court concluded that because article I, section 13 "does accord Texas citizens additional rights, we choose not to decide this case on the basis of the United States Constitution." *Id.* at 664.[26] Holding legislation increasing a filing fee unconstitutional under the state open courts provision, we noted in *LeCroy*, 713 S.W.2d at 338, that "state constitutions can and often do provide additional rights for their citizens." [27] We relied on the Texas Constitution because "[b]y enforcing *our* constitution, we provide Texans with their full individual rights and strengthen federalism." *Id.* at 339 (emphasis added). In doing so we observed that Texas is "in the mainstream of

---

State Constitutions ); Stewart G. Pollock, *Adequate and Independent State Grounds as a Means of Balancing the Relationship Between State and Federal Courts*, 63 Tex.L.Rev. 977 (1985) (hereinafter Pollock, *Independent State Grounds* ); Hans A. Linde, *E Pluribus—Constitutional Theory and State Courts*, 18 Ga.L.Rev. 165 (1983) (hereinafter Linde, *E Pluribus* ); Hans A. Linde, *First Things First: Rediscovering the State's Bills of Rights*, 9 U.Balt.L.Rev. 379, 383 (1980). *See also Commonwealth v. Edmunds*, 526 Pa. 374, 586 A.2d 887, 894, 903 (1991) (looking to federal law first but then relying on the state constitution); *State v. Larocco*, 794 P.2d 460 (Utah 1990) (federal law examined but rejected as inadequate); *City of Hillsboro v. Purcell*, 306 Or. 547, 761 P.2d 510 (1988) (discussing federal law but then deciding the case under the state constitution); *Colorado Civil Rights Comm'n v. Traveler's Ins. Co.*, 759 P.2d 1358, 1362–63 (Colo.1988) (reversing the lower court for relying on federal law when the state constitution contained unique provisions).

24. In 1889, for instance, this court applied the state constitution to protect non-residents from wage garnishment, concluding that "[w]e do not consider it necessary to discuss the effect which the adoption of the Fourteenth amendment to the constitution of the United States had with reference to state statutes discriminating in favor of its own citizens." *Bell v. Indian Live-Stock Co.*, 11 S.W. 344, 345 (Tex.1889).

25. The experience of finding state constitutionally guaranteed free speech prior to the application of the First Amendment to the states was shared by many sister states. *See* Utter, *State Court Comment*, at 1033 (free speech rights "received attention in state courts before their interpretation by the federal courts."). The First Amendment was not applied to the states until *Gitlow v. New York*, 268 U.S. 652, 45 S.Ct. 625, 69 L.Ed. 1138 (1925), and prior restraints were not considered in the context of gag orders until *Near v. Minnesota*, 283 U.S. 697, 51 S.Ct. 625, 75 L.Ed. 1357 (1931). Twenty-eight years earlier, a Texas court had addressed the issue of gag orders in *Ex Parte Foster*, 71 S.W. 593.

26. This approach was again applied to invalidate a similar statute in *Nelson v. Krusen*, 678 S.W.2d 918, 921 (Tex.1984) ("Our disposition of the Nelson's open courts argument makes consideration of the other constitutional claims unnecessary.").

27. The recent increase in cases by this court which rely solely on the Texas Constitution has received national attention. *See* Ken Gormley, *Significant Developments in State Constitutional Law*, 2 Emerging Issues in St. Const.L. 1, 29 (1989).

What the concurrence really urges today is that we overrule the enlightened thinking of *LeCroy* regarding the "independent vitality" of our constitution and discard an entire series of rulings by this court.

this [state constitutionalism] movement." *Id.* at 338. The next year, the court voided a gender-based distinction in the Family Code based solely on the Texas Constitution. *In re Baby McLean,* 725 S.W.2d 696, 698 (Tex.1987) ("[b]ecause we hold that [a provision] of the Texas Family Code violates the Texas Constitution, we need not reach the federal law issues"). Hence, in the past decade this court has strongly reaffirmed its continued commitment to our state constitution.[28]

This approach has also been embraced by our sister court, the Texas Court of Criminal Appeals. We give thoughtful consideration to that court's analysis in part to avoid conflicting methods of constitutional interpretation in our unusual system of bifurcated highest courts of appeal. *See Commissioners' Court of Nolan County v. Beall,* 98 Tex. 104, 81 S.W. 526, 528 (1904). As noted above, in two early prior restraint cases, the Court of Criminal Appeals applied the state constitution to strike down orders that the press not publish testimony until after a trial was completed. In *Ex Parte Foster,* 71 S.W. 593, the court looked both to Texas' free speech clause and also our guarantee of public trials. *Id.* at 595. A year after this court decided *Traveler's Insurance Co. v. Marshall,* the Court of Criminal Appeals again relied on the state constitution in deciding *Ex Parte McCormick,* 88 S.W.2d 104, an equally notable case.[29] Most recently in *Heitman v. State,* 815 S.W.2d 681 (Tex.Crim.App.1991) (en banc), the argument that the Texas Constitution intended harmony with the federal Fourth Amendment was disavowed. *Id.* at 682. The court explained that it "may review and 'rethink' federal constitutional decisions and thereby ensure that ... [Texas] citizens will have the 'double security' the federal constitution was in-

tended to provide." *Id.* at 687. After analysis of the history and placement of the Bill of Rights in our constitution, the court concluded that "[c]learly our own state constitution was not intended by our own founding fathers to mirror that of the federal government." *Id.* at 690.

This commitment of Texas to its own constitution is consistent with the principle of federalism embodied in the United States Constitution. Its authors intended that "[i]n the compound republic of America, the power surrendered by the people is divided between two distinct governments.... *Hence a double security arises to the rights of the people." The Federalist* No. 51, at 323 (James Madison) (Clinton Rossiter ed., 1961) (emphasis added). The United States Supreme Court has long recognized that "[i]t is fundamental that state courts be left free and unfettered by us in interpreting their state constitutions." *Minnesota v. National Tea Co.,* 309 U.S. 551, 557, 60 S.Ct. 676, 679, 84 L.Ed. 920 (1940). It has reiterated its unwillingness to "limit the authority of the State ... to adopt in its own Constitution individual liberties more expansive than those conferred by the Federal Constitution." *Pruneyard Shopping Center v. Robins,* 447 U.S. 74, 81, 100 S.Ct. 2035, 2040, 64 L.Ed.2d 741 (1980). Noting that the language of the Texas Constitution's due process and equal protection clauses is broader than the federal, it has concluded that:

> [A] state is entirely free to read its own State's constitution more broadly than this Court reads the Federal Constitution, or to reject the mode of analysis used by this Court in favor of a different analysis of its corresponding constitutional guarantee.

---

**28.** *See also Whitworth v. Bynum,* 699 S.W.2d 194, 197 (Tex.1985) ("[h]aving decided the statute to be unconstitutional under the Texas Constitution," the court found addressing the federal constitutional question unnecessary); *Hajek v. Bill Mowbray Motors, Inc.,* 647 S.W.2d 253 (Tex.1983) (per curiam) (relying solely on the Texas Constitution to invalidate a temporary injunction against driving a car with a lemon painted on it and a message disparaging the

dealership which sold the car, and reversing a court of appeals opinion which relied solely on federal law).

**29.** *See also, Olson v. State,* 484 S.W.2d 756, 762 (Tex.Crim.App.1972) (opinion on motion for rehearing) ("as to the true scope of the Texas Constitution, we must ultimately follow our own lights").

*City of Mesquite v. Aladdin's Castle, Inc.,* 455 U.S. 283, 293, 102 S.Ct. 1070, 1077, 71 L.Ed.2d 152 (1982).[30] Indeed, the failure of a state judiciary to rely on its own constitution has appropriately been criticized for "thereby increas[ing] its own burdens as well as ours." *Massachusetts v. Upton,* 466 U.S. 727, 735, 104 S.Ct. 2085, 2089, 80 L.Ed.2d 721 (1984) (per curiam) (Stevens, J., concurring).[31]

 The only limit on the states is that, in relying on their constitutions, they may not deny individuals the minimum level of protection mandated by the Federal Constitution. *See Sax,* 648 S.W.2d at 664 ("While it is true that state constitutional protections cannot subtract from those rights guaranteed by the United States Constitution, there certainly is no prohibition against a state providing additional rights for its citizens."); *LeCroy v. Hanlon,* 713 S.W.2d at 338. This approach has been referred to as a "federal safety net," ensuring that individuals receive all available guarantees of their rights. Shirley S. Abrahamson, *Reincarnation of State Courts,* 36 Sw.L.J. 951, 959 (1982).

The involvement of state courts is particularly appropriate in the protection of free speech rights. Both state and federal courts have recognized such rights "as involving community standards and local trends." Judith S. Kaye, *A Midpoint Perspective on Directions in State Constitutional Law,* 1 Emerging Issues in St. Const.L. 17, 23 (1988). Particularly in the context of judicial proceedings, state courts have long been involved with the protection of speech rights.[32] In the current case, the state interest is all the greater since at issue is the order of a Texas judge instructing members of the Texas bar and their Texan clients not to discuss a case ongoing in a Texas court with anyone.

### B.

Our Texas charter bears the distinction of being one of the few state constitutions that were derived from its own independent, national constitution. *See* M.P. Duncan III, *Terminating the Guardianship: A New Role for State Courts,* 19 St. Mary's L.J. 809, 839 (1988) (hereinafter Duncan, *State Courts*).[33] As we empha-

**30.** *See also Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 347–48, 94 S.Ct. 2997, 3010–11, 41 L.Ed.2d 789 (1974) (explicitly leaving the states free to develop their own standard of liability for a publisher of defamatory falsehoods about private individuals); *Branzburg v. Hayes,* 408 U.S. 665, 706, 92 S.Ct. 2646, 2669, 33 L.Ed.2d 626 (1972) ("It goes without saying, of course, that we are powerless to bar state courts from responding in their own way and construing their own constitutions so as to recognize a newsman's privilege."). The concurrence, though urging adherence to federal precedent, fails to acknowledge that the federal courts have encouraged state courts to embark upon independent analysis of their own constitutions.

**31.** *See also People v. Scott,* 79 N.Y.2d 474, 505, 583 N.Y.S.2d 920, 939, 593 N.E.2d 1328, 1347 (1992) (Kaye, J., concurring) ("Time and time again in recent years, the Supreme Court as well as its individual Justices have reminded state courts not merely of their right but also of their responsibility to interpret their own constitutions...."); Stanley H. Friedelbaum, *Supreme Courts in Conflict: The Drama of Disagreement,* 17 Intergovernmental Perspective 27, 27 (1991) (the renewed emphasis on state constitutional law met with broad approval from all members of the U.S. Supreme Court).

**32.** *See, e.g., Barron v. Florida Freedom Newspapers, Inc.,* 531 So.2d 113 (Fla.1988) (dissolving a protective order in a marital dissolution proceeding primarily on state constitutional grounds); *State v. Coe,* 101 Wash.2d 364, 679 P.2d 353 (1984) (trial court order restraining the press violates the state constitution); *State ex rel. Herald Mail Co. v. Hamilton,* 165 W.Va. 103, 267 S.E.2d 544 (1980) (relying on the state constitution to disallow a trial court order closing the court during portions of the pretrial of a murder case.); *Phoenix Newspapers, Inc. v. Superior Court,* 101 Ariz. 257, 418 P.2d 594 (1966) (striking down prior restraint against press reporting); *Dailey v. Superior Court,* 112 Cal. 94, 44 P. 458 (1896) (voiding injunction against performance of play depicting story of case then on trial).

**33.** "No set of legal institutions or prescriptions exists apart from the narratives that locate it and give it meaning. For every constitution there is an epic...." Robert M. Cover, *Foreword: Nomos and Narrative,* 97 Harv.L.Rev. 4, 4 (1983).

The opposite view taken by the concurrence receives support from Professor Gardner, who argues that "Americans are now a people who are so alike from state to state; and whose identity is so much associated with national values and institutions, that the notion of significant local variations in character and identity is just too implausible to take seriously." James

"[t]he powers restricted and the individual rights guaranteed in the present constitution reflect Texas' values, customs, and traditions." 713 S.W.2d at 339. The diverse drafters of our Constitution represented a "heterogenous miscellany of opinions." [34] The experiences and philosophies of this group were far different than those who sat in a Philadelphia meeting hall a century earlier.[35] As expressed by one commentator, "[o]ur Texas Forbears surely never contemplated that the fundamental state charter, crafted after years of rugged experience on the frontier and molded after reflection on the constitutions of other states, would itself veer in meaning each time the United States Supreme Court issued a new decision." James C. Harrington, *The Texas Bill of Rights* 41 (1987).[36]

Our state had a unique opportunity to address issues of state constitutionalism and federalism in the 1875 constitutional convention. Though some Texans feared that convening such a gathering so soon after Reconstruction would indicate too much independence from the federal government,[37] the convention was held. In the election of 1873, Democrats swept most state offices, including Richard Coke as Governor. Confronting the propriety of this election in *Ex Parte Rodriguez*, 39 Tex. 705 (1874), the Texas Supreme Court relied primarily on federal caselaw and the placement of a semicolon to declare the election illegal under the Texas Constitution.[38] The newly elected officials nonetheless came to Austin[39] and enacted a constitutional amendment reorganizing the

A. Gardner, *The Failed Discourse of State Constitutionalism*, 90 Mich.L.Rev. 761, 818 (1992) (hereinafter Gardner, *Failed Discourse*). He adds his "belief" that "few Americans identify themselves with a community purporting to embrace an entire state." *Id.* at 835. When contrasted with the just pride that our citizens feel in being Texans, perhaps this very writing by an Associate Professor at the Western New England College School of Law demonstrates how truly diverse this nation remains. Texans value our institutions and heritage, and our citizens would certainly dispute that their concerns are identical to those of the people of Rhode Island or North Dakota. Unlike the concurrence, we share the view of Woodrow Wilson, who observed that ours is "a singularly various country." Woodrow Wilson, *The Political Thought of Woodrow Wilson* 130–31 (E. David Cronon, ed. 1965) (hereinafter Woodrow Wilson, *Political Thought*).

**34.** *The Constitutional Convention,* Galveston Daily News, May 14, 1875 at 1, col. 1.

**35.** For discussions of some of those differences, see Ponton, *Sources of Liberty;* James C. Harrington, *Reemergence of Texas Constitutional Protection,* 2 Emerging Issues in St. Const.L. 101, 106 & n. 22 (1989).

**36.** The few existing critics of state constitutionalism, *see supra,* note 22, have challenged the legitimacy of those constitutions on the basis that they actually lack meaningful, independent identities. *See generally,* Gardner, *Failed Discourse.* Gardner suggests that:

If we are to take seriously the notion that the state constitution reveals the character of the people, we may be forced to the unappetizing conclusion that the people of New York, or California, *or Texas* are simply a frivolous

people who are unable to distinguish between things that are truly important and things that are not.... A people who are frivolous, or fickle, or unreflective, are a people not worthy of respect.

*Id.* at 819–20 (emphasis added). He continues that "[t]he stories to which [state constitutions] lend themselves are not stories of principle and integrity, but stories of expediency and compromise at best, foolishness and inconstancy at worst." *Id.* at 822. Rather than lending credence to this position with a lengthy response, we let our opinion today stand as an example of the effective role that a carefully crafted and well-grounded state constitution can play. To accept the proposition that our constitution is simply a thing of frivolity is to erase well over a century of history and of law as well as to undermine the very foundation of this court.

**37.** Having a constitutional convention "without consulting the national authority" might give the United States Congress "a pretext to charge us with bad faith, with a violation of the conditions upon which the Reconstruction laws were declared inoperative," wrote one Waco citizen. Galveston Daily News, Jan. 8, 1874 at 2, col. 6.

**38.** Earning the nickname of the "Semicolon Court," Calvert & De Leon at 146, the court was harshly attacked:

[T]he rule is ... imperative that *constitutions and statutes are to be liberally and scrupulously construed with reference to that supreme consideration—the free and effective expression of the will of the body of electors. A Principle That Should Govern,* Galveston Daily News, Jan. 3, 1874 at 1, col. 1 (emphasis added).

**39.** Galveston Daily News, Jan. 14, 1874, at 1, col. 2.

Supreme Court, which enabled Governor Coke to remove all three justices.

Just as our history is distinctive in its insistence that our constitution is of independent force, so is the very letter of that fundamental document. The Texas Constitution begins with the declaration that: "Texas is a free and independent State, subject only to the Constitution of the United States, and the maintenance of our free institutions and perpetuity of the Union depend upon the preservation of the right of local self-government, unimpaired to all the States." Tex.Const. art. I, § 1. Citing this article as a reason for ratifying the 1876 Constitution, Governor Coke explained that:

[T]he new constitution declares, not as does the old one, that ... *the perpetuity of our free institutions depends upon the preservation unimpaired of the right of local self-government to all the States.* The reassertion of these great principles of government, and *the expulsion from our organic law of that insult to the intelligence of the people of Texas, which denies them the right of self-government, their heritage and birthright* ... and declares them [mere] vassals and serfs of [the federal government], is worth a thousand fold the cost and effort expended in making the new constitution, even if no other changes had been made.

Address of Governor Coke, *in Ratify*, Galveston Daily News, Dec. 19, 1875 at 2, col. 4 (emphasis added) (hereinafter Coke Address).[40] The prominent language of section one and the words of its framers clari-

fy that our current Constitution intends to maintain the vitality and independence of our state law to the extent permissible under the Federal Constitution.

Basing decisions on the state constitution whenever possible avoids unnecessary federal review. This not only lessens federal interference into state issues, but also results in "efficient judicial management." [41] This approach relieves the overburdened docket of the United States Supreme Court, and spares state courts from having to deal anew with cases on remand. *See Upton*, 466 U.S. at 735, 104 S.Ct. at 2089 (Stevens, J., concurring). This efficiency is evidenced by several recent cases in which state courts decided that protection was available to an individual under the federal constitution, only to have the decision reversed by the Supreme Court.[42] Justice Hans Linde, formerly of the Oregon Supreme Court, explains that in each of those cases:

[T]he state's appellate court was convinced of an important constitutional right. In each case, that right was guaranteed by the state's own constitution.... [T]hese cases did not need to go to the United States Supreme Court. The Court's nationwide pronouncement on those issues were not necessary. The cases could have ended with the state court's decisions if the state courts had not chosen otherwise.[43]

Subsequently, several state courts on remand relied on state law to reach the same result originally reached under their read-

---

**40.** Delegate Flournoy echoed these sentiments. In describing the former section one, which allowed the state to change its laws only "subject to the national authority," he stated:

[It] embrace[d] in the constitution a mere useless insult to the great mass of the people of Texas, but also ... assert[ed] a fundamental principle of government utterly at war with the whole theory of American republicanism....

[I]t is an abandonment of the elementary law of State government in this Union to place the right of local self government subject to the national authority.... [T]o declare that the national authority (which means, if anything, the party temporarily in power) shall authorize or inhibit the people of

Texas from managing their local affairs is a step toward centralism ... further than the people of any State have ever dreamed of going.

Address of Delegate Flournoy, *in Ratify*, Galveston Daily News, Dec. 19, 1875, at 2, col. 5.

**41.** Pollock, *Independent State Grounds*, at 984 (1985).

**42.** *See* Hans A. Linde, *Does the "New Federalism" Have a Future?*, 4 Emerging Issues in St. Const.L. 251, 252–53 (1991) (hereinafter Linde, *New Federalism*).

**43.** *Id.* at 253.

ing of the federal law.[44] Such a cumbersome and time-consuming process obviously contributes little to an efficient judiciary. The soundest way to avoid such unnecessary review and delay for litigants is to rely on the state constitution in the first instance.

Once the state court turns to its own constitution, it both enables a local voice in the judicial process and ensures its role as a national leader. "State constitutions allow the people of each state to choose their own theory of government and of law, within what the nation requires, to take responsibility for their own liberties, not only in courts but in the daily practice of government."[45] A state's constitution "is a fit place for the people of a state to record their moral values, their definition of justice, their hopes for the common good. A state constitution defines a way of life."[46] The revival of "new federalism" has thus "returned popular constitutionalism to the American stage."[47] State constitutions "lead all of us to face closer to home some fundamental values that the public has become accustomed to have decided for them by the faraway oracles in the marble temple." Hans A. Linde, *First Things First: Rediscovering the States' Bills of Rights*, 9 U.Balt.L.Rev. 379, 395 (1980) (hereinafter Linde, *First Things First*).

While reflecting local concerns and assuring local accountability, reliance by this court on our own constitution allows Texas to have a meaningful voice in developing this nation's jurisprudence. What Justice Brandeis wrote sixty years ago regarding state legislatures is now particularly applicable to state judicial action: "It is one of the happy incidents of the federal system that a single courageous State may, if its citizens choose, serve as a laboratory; and try novel social and economic experiments without risk to the rest of the country." *New State Ice Co. v. Liebmann*, 285 U.S. 262, 311, 52 S.Ct. 371, 386–87, 76 L.Ed. 747 (1932) (Brandeis, J., dissenting).[48] Just as other states may rely on unique Texas law developed independently by the legislature and judiciary of this state, this court has a growing responsibility as one of fifty laboratories of democracy to assist the federal courts in shaping the fundamental constitutional fabric of our country.[49] The poet

44. *See, e.g., White v. State*, 521 S.W.2d 255 (Tex. Crim.App.1974), *rev'd*, 423 U.S. 67, 96 S.Ct. 304, 46 L.Ed.2d 209 (1975), *on remand*, 543 S.W.2d 366 (Tex.Crim.App.1976) (noting that search was invalid under state constitution, but that the argument was waived); *State v. Hershberger*, 444 N.W.2d 282 (Minn.1989), *vacated*, 495 U.S. 901, 110 S.Ct. 1918, 109 L.Ed.2d 282 (1990), *on remand*, 462 N.W.2d 393 (Minn.1990) (finding slow-moving vehicle sign requirement on Amish carriages in violation of state free exercise rights); *Upton*, 466 U.S. 727, 104 S.Ct. 2085, *on remand*, *Commonwealth v. Upton*, 394 Mass. 363, 476 N.E.2d 548 (1985); *State v. Kennedy*, 295 Or. 260, 666 P.2d 1316 (1983) (affirming criminal conviction despite prosecutorial misconduct under state constitution on remand from the Supreme Court); *State v. Opperman*, 89 S.D. 25, 228 N.W.2d 152 (1975), *rev'd*, 428 U.S. 364, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976), *on remand*, 247 N.W.2d 673 (S.D.1976) (finding a search unconstitutional under state law).

45. Linde, *E Pluribus*, at 199.

46. A.E. Dick Howard, *The Renaissance of State Constitutional Law*, 1 Emerging Issues in St. Const.L. 1, 14 (1988).

47. Ronald K.L. Collins, *Forward, Reliance on State Constitutions—Beyond the "New Federalism"*, 8 U. Puget Sound L.Rev. vi, xi (1985). One example of this popular constitutionalism is *Hewitt v. Saif*, 294 Or. 33, 653 P.2d 970, 975 (1982), which declined to follow federal equal protection analysis because it involved "outmoded" national stereotypes of the roles of men and women which were no longer applicable in Oregon.

48. As one former president observed:

We know that ... it would be folly to apply uniform rules of development to all parts of the country, that our strength has been in the elasticity of our institutions, in the almost infinite adaptability of our laws, that our vitality has consisted largely in the dispersion of political authority, in the necessity that communities should take care of themselves and work out their own order and progress." Woodrow Wilson, *Political Thought*, at 130–31.

49. Federalism is not a one-way street. Just as we have sometimes looked to federal law for guidance, the United States Supreme Court has in the past looked to state constitutional jurisprudence in developing its own law. In *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), the court applied the approach of several state courts to race-based peremptory challenges, noting that at least two federal courts of appeal had already "follow[ed]

who only quotes the works of others is destined to be both ignored and forgotten.[50]

As a state court, sitting in Texas, our expertise is in Texas law, our judges are Texas citizens and members of the Texas Bar, and our concerns are Texas concerns. If we simply apply federal law in all cases, why have a Texas Constitution, and why have a Texas Supreme Court? We agree that "it is fundamentally illogical for a state court to skip past guarantees provided in the state's own law, for which the court itself is responsible, and then to conclude that its state falls short of the national standards...." Linde, *New Federalism*, at 256.

### C.

Having concluded that there are numerous reasons *why* the state constitution should be applied, we are left to consider *how* to apply it. Today's opinion has centered on a historical review to understand the origins of our liberties as Texans and the intentions of our forebears. This focus should not, however, be misconstrued to suggest any deviation from our traditional method of constitutional interpretation. In *Edgewood Indep. Sch. Dist. v. Kirby*, 777 S.W.2d 391 (Tex.1989), we outlined an appropriate approach:

> In construing [a provision of the Texas Constitution], we consider "the intent of the people who adopted it." In determining that intent, "the history of the times

out of which it grew and to which it may be rationally supposed to have direct relationship, the evils intended to be remedied and the good to be accomplished, are proper subjects of the inquiry." However, because of the difficulties inherent in determining the intent of voters over a century ago, we rely heavily on the literal text. We seek its meaning with the understanding that the Constitution was ratified to function as an organic document to govern society and institutions as they evolve through time.

*Id.* at 394 (citations omitted). *See also Damon v. Cornett*, 781 S.W.2d 597 (Tex. 1989); *Vinson v. Burgess*, 773 S.W.2d 263 (Tex.1989).[51]

Our rich history demonstrates a long-standing commitment in Texas to freedom of expression as well as a determination that state constitutional guarantees be given full meaning to protect our citizens. But historical analysis is only a starting point. The constitution of our state is an organic document. *Edgewood*, 777 S.W.2d at 394. In no way must our understanding of its guarantees be frozen in the past; rather, our concept of freedom of expression continues to evolve over time. *See id.* Forms of expression not widely approved in 1875 may well demand state constitutional protection today, just as new methods of infringing on speech may require new methods of protection tomorrow.[52]

the lead of a number of state courts construing their State's Constitution." *Id.* at 82 n. 1, 106 S.Ct. at 1715 n. 1. *See also Mapp v. Ohio*, 367 U.S. 643, 651, 81 S.Ct. 1684, 1689, 6 L.Ed.2d 1081 (1961) (holding evidence seized in violation of the federal constitution inadmissible, and noting that over half the states had already adopted this approach).

**50.** One of the few possible criticisms of reliance on state constitutions is the notion that a crisis in national stability will result. *See* Gardner, *Failed Discourse*, at 818, 827 (raising the specter of the Civil War and of the breakup of the former Soviet Union). The approach we utilize today has not before and will not contribute to the demise of this nation, for Texas and other states have long applied different laws, yet the Union survives. Diversity is precisely what our federalism intends, even though the result is sometimes "untidy." Pollock, *Independent State*

*Grounds*, at 979. Even our system of lawyer licensing recognizes the need for attorneys to be expert in the law of their own state. If our sole, supreme value were uniformity, this court could close its doors, and Texas attorneys could simply take a federal bar examination.

**51.** *See also LeCroy*, 713 S.W.2d at 339; *Sax v. Votteler*, 648 S.W.2d 661; *In re Baby McLean*, 725 S.W.2d at 698 (concluding that because the Texas Equal Rights Amendment of 1972 was worded differently than the earlier enacted federal provision, it may have intended different results).

**52.** Our analysis of the history of Texas and its constitution thus in no way detracts either from the dignity of the text itself or from the realities of the present. Rather, we use history to assist in an understanding of the generalities and ambiguities sometimes present in a constitution.

In interpreting our constitution, this state's courts should be neither unduly active nor deferential; rather, they should be independent and thoughtful in considering the unique values, customs, and traditions of our citizens. With a strongly independent state judiciary, Texas should borrow from well-reasoned and persuasive federal procedural and substantive precedent when this is deemed helpful,[53] but should never feel compelled to parrot the federal judiciary.[54] With the approach we adopt, the appropriate role of relevant federal case law should be clearly noted, in accord with *Michigan v. Long*, 463 U.S. 1032, 1040–41, 103 S.Ct. 3469, 3476–77, 77 L.Ed.2d 1201 (1983) (presuming that a state court opinion not explicitly announcing reliance on state law is assumed to rest on reviewable federal law). A state court must definitely provide a "plain statement" that it is relying on independent and adequate state law,[55] and that federal cases are cited only for guidance and do not compel the result

reached. *Id.* at 1040–41, 103 S.Ct. at 3476–77. *See also* William J. Brennan, *The Bill of Rights and the States: The Revival of State Constitutions as Guardians of Individual Rights*, 61 N.Y.U.L.Rev. 535, 552 (1986). *Long* offers further reason for developing state constitutional law, since now courts, rather than merely adjudicating state constitutional claims, must be prepared to defend their integrity by both quantitatively and qualitatively supporting their opinion with state authority." Duncan, *State Courts*, at 838. Consistent with this method, we may also look to helpful precedent from sister states in what New Jersey Justice Stewart Pollock has described as "horizontal federalism." Stewart G. Pollock, *Adequate and Independent State Grounds as a Means of Balancing the Relationship Between State and Federal Courts*, 63 Tex.L.Rev. 977, 992 (1985).[56]

Our consideration of state constitutional issues is encumbered when they are not

**53.** *See, e.g., Commonwealth v. Edmunds*, 526 Pa. 374, 586 A.2d 887, 895 (1991) (federal precedent may be cited, but it is not binding on the state court). As Justice Brennan summarized this approach:

[S]tate court judges ... do well to scrutinize constitutional decisions by federal courts, for only if they are found to be logically persuasive and well-reasoned, paying due regard to precedent and the policies underlying specific constitutional guarantees, may they properly claim persuasive weight as guideposts when interpreting counterpart state guarantees.

William J. Brennan, *State Constitutions and the Protection of Individual Rights*, 90 Harv.L.Rev. 489, 502 (1977).

**54.** "We do not think that an opinion, even though it be by the Supreme Court of the United States," which improperly disregards the rights of Texans, should "be 'seriously regarded' by the courts of Texas." *Kemper v. State*, 63 Tex.Cr.R. 1, 138 S.W. 1025, 1044–45 (App.1911) (rejecting the federal rule allowing introduction at trial of evidence obtained at a preliminary investigation from an unavailable witness). In reconsidering and overruling the substantive rule of *Kemper* in *Robertson v. State*, 63 Tex.Cr.R. 216, 142 S.W. 533 (App.1912), the Court of Criminal Appeals did not simply "defer[ ] to the Supreme Court's interpretation," 834 S.W.2d at 41, but rather relied on the particular state constitutional language involved and considered rulings in other state and federal courts. Louisiana, also following this approach, rejected federal equal protec-

tion analysis because "[t]he federal three level system is in disarray and has failed to provide a theoretically sound framework for constitutional adjudication." *Sibley v. Bd. of Supervisors of Louisiana State University*, 477 So.2d 1094, 1107 (La.1985) (plurality opinion).

**55.** For various attempts at an adequate "plain statement," see *Long v. State*, 742 S.W.2d 302, 323 n. 22 (Tex.Crim.App.1987) (en banc); *State v. Kennedy*, 295 Or. 260, 666 P.2d 1316, 1321 (1983); *State v. Ball*, 124 N.H. 226, 471 A.2d 347, 352 (1983). *See also supra*, note 17.

**56.** *See, e.g., Strahler v. St. Luke's Hosp.*, 706 S.W.2d 7, 10–11 (Mo.1986) (en banc) (following this court's methodology and result in *Sax* in striking down a statute of limitations under the Missouri Constitution); *Mountain States Tel. & Tel. Co. v. Arizona Corp. Comm'n*, 160 Ariz. 350, 773 P.2d 455, 460 (1989) (following the Texas Court of Criminal Appeals' approach in *McCormick* and *Foster* in striking down prior restraints against newspapers under their own state constitution); *Coleman v. Utah State Land Bd.*, 795 P.2d 622, 632 n. 2 (Utah 1990) (looking to other states' constitutions to help determine whether the Utah Constitution's provisions are self-executing); *Horton v. Meskill*, 172 Conn. 615, 376 A.2d 359, 373 (1977) (examining the law of other states rather than the Supreme Court's opinion in *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973), in striking down state's school financing).

fully developed by counsel. Many of our sister states, when confronted with similar difficulties, have nevertheless decided cases solely on state grounds or ordered additional briefing of the state issue.[57] We will follow this procedure as necessary and appropriate, when asserted state grounds have not been adequately briefed.[58]

### D.

Rejecting our careful and detailed analysis of the development and interpretation of article one, section eight, the concurrence advances an alternative—Texas judges should follow, but never lead, federal jurisprudence. Whenever both federal and state constitutional provisions "overlap or correspond," 834 S.W.2d at 40, the Texas judge should never diverge from the path taken by the federal judiciary. No aspect of Texas history, no series of Texas decisions such as that present here should obscure the obligation of adherence to federal authority.

Texans, we are told, must journey along the "well-traveled road of [federal constitutional] jurisprudence." *Id.* at 29. "[I]t is inefficient to blaze a trail through the wilderness when there is a perfectly good highway there already, built at considerable expense, and well traveled." *Id.* at 40. A traveller relying upon the concurrence's map will, however, find considerable detail missing—the road is marred with chugholes; unmarked detours appear; new roadblocks arise. The most crucial part of the route is just a dotted line where road construction has not yet even gotten underway. Viewed from this jurisprudential federal interstate charted by the concurrence, the history of the Texas Constitution is a mere farm to market road; the past decisions of this court, only undistinguished country lanes.

The fallacy in the concurrence's roadwork is shown by both the federal law upon which it relies[59] and the state law upon which it does not. Because a prior restraint of the type involved here has not previously been the subject of an adequate pronouncement from Washington, the concurrence must search elsewhere for the federal mandate by which all Texans are to be bound. Its dim new travel beacon is *Bernard v. Gulf Oil Co.*, 619 F.2d 459, 467 (5th Cir.1980) (en banc), *aff'd on other grounds*, 452 U.S. 89, 101 S.Ct. 2193, 68 L.Ed.2d 693 (1981). Described by the concurrence as "[t]he principal authority appl[icable]," 834 S.W.2d at 26, *Bernard* today achieves a renown which it has not previously enjoyed. Nevertheless, we learn much from carefully reviewing it. The complexity and unpredictability of federal law reflected in *Bernard* is evidenced by the fact that the relevant issue there was initially decided the opposite way,[60] was reconsidered in part because no other federal appellate court had ever ruled on it,[61] was decided on a very splintered vote, and thereafter disregarded by the United States Supreme Court.[62] On only three occasions have even the federal courts extracted a test from *Bernard.*[63] Solely by

---

57. *See Barrio v. San Manuel Div. Hosp.*, 143 Ariz. 101, 692 P.2d 280, 283 (1984); *Gray v. Dep't of Employment Sec.*, 681 P.2d 807, 825 n. 2 (Utah 1984) (Durham, J., concurring and dissenting); *State v. Opperman*, 247 N.W.2d 673 (S.D.1976). For cases which ordered further briefing, see *State v. Jewett*, 146 Vt. 221, 500 A.2d 233, 234 (1985); *State v. Kennedy*, 295 Or. 260, 666 P.2d 1316, 1321 (1983).

58. Legal academia may have unwittingly contributed to the common failure of counsel to brief thoroughly state constitutional issues by sometimes viewing them as the "bush league of constitutional law." Linde, *New Federalism*, at 251.

59. *See supra*, notes 16, 19 & 20.

60. *Bernard v. Gulf Oil Co.*, 596 F.2d 1249 (1979), *reversed in part*, 619 F.2d 459.

61. 619 F.2d at 466.

62. The Supreme Court declined to "decide what standards are mandated by the First Amendment in this kind of case." 452 U.S. at 104, 101 S.Ct. at 2201–02.

63. *See Kleiner v. First Nat. Bank of Atlanta*, 751 F.2d 1193 (11th Cir.1985) (upholding the validity of a gag order under *Bernard* because it regulated only commercial speech); *Domingo v. New England Fish Co.*, 727 F.2d 1429 (9th Cir. 1984); *Kilgo v. Bowman Transp., Inc.*, 88 F.R.D. 592 (N.D.Ga.1980). Like *Bernard,* each of these three considered gag orders only in the limited

the most particularized selection of some of the many considerations in that procedurally unique case can the concurrence begin to construct the elements of a test having remote similarity with that we adopt today.

The concurring justices recite a method for interpretation of our state constitutional guarantees that closely parallels our traditional approach in *Edgewood* and other cases [64] with one notable twist. They add an entirely new element [65] and then proceed to reject each factor with the exception of this one new arrival—federal precedent.[66] Although differences in the language of the state and federal constitutional free speech provisions are declared to be as "plain as day," 834 S.W.2d at 32, those differences are repudiated as meaningless.

Despite the purported need to look to the historical context in which the provision was written, the concurrence trivializes the rather extensive historical discussion which we offer.[67] From our treasured state heritage, law and institutions, the concurrence claims, we can derive nothing. Only federal law, based on different language, different history and different cases, can resolve the issue we face today.

Our attempt to give effect to what is indelibly written into our state constitution is dismissed in a series of buzzwords: "chauvinism," "arrogan[ce]" "autonomy," and "liberal agenda." *Id.* at 41, 43, 39 & 43. Instead, the concurrence urges that we exclude any considerations specific to Texas in favor of conformity to a federal standard. Claiming that Texas was never "unique nor first," *id.* at 33, the concurrence accuses the court of disrupting the

harmony among the states regarding free speech nationwide. *Id.* at 25. We do not say that the Texas guarantee of free expression inevitably varies in all particulars from the federal, or that of New York or California. Rather, consistent with the very diversity that supplies strength to our union, we build from experience in Texas and elsewhere to enhance individual liberty. The national jurisprudence benefits as states across our country offer similar contributions. As individual voices develop strength and tone, so does the grand chorus improve.

After ignoring all that is unique to Texas, the concurring justices repeatedly accuse the court of disregarding relevant federal law when we quite obviously do not. *Id.* at 25, 35 & 38–39. Federal decisions are potentially helpful but do not inextricably bind Texas in analyzing our constitution. Failing to differentiate between thoughtful review and unquestioning acceptance of federal rulings, the concurrence also mistakenly assumes that independent interpretation must necessarily yield a different result than that achieved by the federal judiciary. This, of course, is not true. Our investigation may reveal federal authority so complete, so well reasoned, and so consistent with the provisions of the Texas Constitution in protecting individual liberties that we reach the same conclusion. Certainly there may be some "congruence" between state and federal constitutions. *Id.* at 34. First Amendment jurisprudence is not irrelevant, but rather

---

context of the federal rules governing class action suits.

**64.** *See supra,* text accompanying note 52.

**65.** [W]e ordinarily look to such things as the language of the constitutional provision itself, its purpose, the historical context in which it was written, the intention of the framers, the application in prior judicial decisions, the relation of the provision to the law as a whole, the understanding of other branches of government, the law in other jurisdictions, *including federal law,* constitutional and legal theory, and fundamental values including justice and social policy.
834 S.W.2d at 30 (emphasis added).

**66.** None of the cases cited by the concurrence support the claim that "we ordinarily look to ... federal law" in interpreting our constitution. 834 S.W.2d at 30. Rather, each relied principally on the same factors as did *Brown v. Meyer,* 787 S.W.2d 42, 45 (Tex.1990): we rest "upon the language and prior construction *of our own constitution.*"

**67.** The assertion that "[n]ot before today has this Court insisted that the [state and federal speech] provisions are different in substance," 834 S.W.2d at 35, utterly ignores the host of cases cited in today's opinion, including the significant observation by this court in *LeCroy* that our constitution "has independent vitality." 713 S.W.2d at 339.

an important body of law to be referenced when well-reasoned.

The concurrence next suggests that the record in this case does not support extensive writing on our state constitutional free speech guarantee.[68] All of this masks a very simple truth—if the parties here had dealt exclusively and extensively with the development and scope of our Texas Constitution, if they had "fully presented" it, the court would still be chastised for relying upon a state provision that has not "grown and developed over time," *id.* at 30, and that represents "largely uncharted terrain." *Id.* at 29. Even with the most completely briefed and argued cause, the concurrence would still seek marching orders from the federal judiciary. We prefer self-reliance. What we accept today is the responsibility to conduct a thoughtful, complete, and independent search for a sound understanding of our most fundamental state law.

### III. The Court Records

Relator contends that she and several parents were denied access to the records in this case after the gag order went into effect. She argues that this constitutes an unwritten sealing order, in violation of Rules 76 and 76a of the Texas Rules of Civil Procedure. One such parent whose child was not represented by the principal plaintiffs' attorneys, Akins and Pettiette, was repeatedly told by a court clerk the file was "sealed" and that "the Judge had put a gag order on the file." Affidavit of Cheryl Finley. Another parent swore that he was told by Judge Garcia personally

that the record was "closed until after the settlement hearing." Affidavit of Larry Carter. The co-owner of a community newspaper indicates that she and the paper's editor were told by a court clerk that the record was "sealed." Affidavit of Marie Flickinger. The former Official Court Reporter for the 151st District Court in Harris County explained that a local reporter had requested access to the transcript of a hearing which considered whether the firm which would potentially administer a settlement had acted improperly. Affidavit of Jacquelyn Miles. When the Court Reporter told the court about this request, "Judge Garcia informed [her] that the file was sealed to members of the general public until after the settlement had been finalized." *Id.*[69]

The Real Parties in Interest, Joseph Edward Powell and Farm & Home Savings Association respond that Judge Garcia never ordered the file sealed. They present an affidavit from the Clerk of the 151st District Court which maintains that "there is no order sealing this file by Judge Garcia," and also that "Judge Garcia has not told me that access to this file is restricted, nor, to my knowledge, has she told anyone else that access to this file is restricted." Affidavit of Chris Sarrat. A parent of one of the children represented by Akins and Pettiette also states that Judge Garcia never represented to her that the files were sealed, and that she was never prohibited from looking at the court's file. Affidavit of Janice Villanueva.

■ Court records "are presumed to be open to the general public." Tex.R.Civ.P.

---

68. The concurrence's selective presentation of the record and argument overlooks both counsel's written and oral pleas for relief under both constitutions. A violation of Relator's state constitutional rights was encompassed by several of her written filings. Relator's Second Request for Emergency Interim Relief, at 2; Petition for Writ of Mandamus and Request for Emergency Relief at 1; Brief of Arguments and Authorities in Support of Relator's Petition for Writ of Mandamus at 7.

At oral argument, Relator contended that "[t]he gag order itself goes far beyond any of the *well established principles established by this court under article I, section eight of the Texas Constitution,* and the First Amendment." Re-

sponding to Justice Hecht (prior to the "colloquy" quoted in the concurrence) counsel again stated that "what the First Amendment teaches us and what the Texas Constitution says *even more for us* is you let the speaker speak at his or her own peril." (emphasis added).

In truth, the parties presented us with as much—or as little—state constitutional law as they did federal. Indeed, there is no preargument mention of *Bernard,* upon which near exclusive reliance is now placed by the concurrence.

69. The Reporter believed, however, that the record was not sealed to the lawyers or parties in the case.

**24**

76a(1), and access to them is separately guaranteed to "[e]ach attorney at law practicing in any court ... at all reasonable times to inspect." Tex.R.Civ.P. 76. The sealing of a record must meet the procedural prerequisites set forth in Rule 76a of the Texas Rules of Civil Procedure. *See Chandler v. Hyundai Motor Co.*, 829 S.W.2d 774 (1992) (per curiam). A court may not escape the strict obligations of those rules by tacitly closing the record through an unwritten order.

In this instance, however, we are presented with conflicting affidavits as to whether the court records were made available to the public. These affidavits create a fact issue which this court may not address on mandamus. *See Brady v. Fourteenth Court of Appeals*, 795 S.W.2d 712, 714 (Tex.1990, orig. proceeding). Additionally, it is the understanding of this court that with the gag order lifted, there should be no impediment to viewing the court records. If, after this opinion issues, Relator should find her access to the records in any way obstructed, she remains free to pursue appropriate remedies.

### IV. Removal of the Guardian ad Litem

■ Relator also urges that she was improperly dismissed as ad litem. While much has been written about the standards for such appointments, there is little guidance on the standard for removal. Relator contends that the appropriate standard is one based on best interest of the child, and the record reveals that Relator may well have acted in that interest, sometimes bringing issues to the court's attention which might not have otherwise been considered. Under the Probate Code a "best interest of the ward" standard is applied in determining the circumstances under which a guardianship can be moved to another county and a guardian replaced. *Tex.Prob. Code* § 123. Other states have applied a

similar standard to removal of ad litems in general.[70]

Under our current procedural rules, however, the sole circumstance in which a guardian ad litem can be appointed is when a minor "is represented by a next friend or guardian who appears to the courts to have *an interest adverse to such minor.*" Tex.R.Civ.P. 173 (emphasis added). This rule as written seems to contemplate only a conflict of interest standard.

Since the trial court's September 1991 dismissal order specifically determined that there was "no conflict of interest," and since the record reflects no such conflict, we find no abuse of discretion.

### Summary

We grant Relator's petition in part and hold that the trial court's gag order is in violation of article I, section 8, of the Texas Constitution. Because the existence of an unwritten sealing order raises a fact issue, we do not address that question. Finally, we determine that the trial court did not abuse its discretion in dismissing Relator as ad litem, and deny the remainder of Relator's petition.

Concurring Opinion by HECHT, J., joined by COOK and CORNYN, JJ.

PHILLIPS, C.J., not sitting.

HECHT, Justice, joined by COOK and CORNYN, Justices, concurring in the judgment.

I join in the Court's judgment, but not in its opinion. I agree that mandamus should issue directing the respondent district court to vacate the gag orders of which relator complains, but not to reinstate relator as guardian ad litem. I also agree that we should not direct the district court to allow relator access to court records when relator has failed to establish that her access to those records has been restricted. I differ

---

**70.** *See Zukerman v. Piper Pools, Inc.*, 232 N.J.Super. 74, 556 A.2d 775, 786 (1989) ("removal must be for good cause ... of misconduct or inability to serve the best interests of the ward"); *Dicupe v. City of New York*, 124 A.D.2d 542, 507 N.Y.S.2d 687, 689 (1986) ("If the court believed

that the [ad litem] was not acting in the child's best interest ... it could have replaced him as a guardian."); *Ford v. Moore*, 79 A.D.2d 403, 436 N.Y.S.2d 882, 884 (1981) (noting power to remove an ad litem "where the interests of the infant will ... be promoted.").

with the Court's reasons for these decisions, however, and write to explain why.

## I

Deciding whether the two gag orders which the district court issued in the pending litigation are invalid is not the principal occupation of the Court's opinion. Those orders have already been ordered vacated in response to relator's request for emergency relief. 837 S.W.2d 73. Our reasons for granting this relief do not require elaborate explanation. The Court is unanimous in the view that the gag orders are invalid because they are too broad, they are not necessary to protect against an imminent threat to the administration of justice, and they were issued without following procedures to safeguard against suppression of relator's constitutionally protected speech. Issuance of the orders was a clear abuse of discretion from which relator has no adequate remedy by appeal. Thus, relator is entitled to mandamus relief to have the orders set aside.

That is the Court's decision. Most of the Court's opinion is spent defending its efforts to decide relator's free speech claims using only article I, section 8 of the Texas Constitution without recourse to the First Amendment to the United States Constitution. Borrowing from the literature of the "new federalism movement" of the past fifteen years, the Court adopts a method of constitutional analysis by which it examines the Texas Constitution first, and if a right is found to be protected, never reaches the federal constitution question. In theory, the Court's methodology contemplates that federal law construing a federal constitutional provision will be instructive but not controlling in construing a corresponding provision of the state constitution; in actuality, the Court attempts to ignore federal law altogether. Accordingly, it ventures an independent examination and application of article I, section 8, with no argument and little briefing by the par-

ties, and without regard to more fully developed First Amendment law. Then after determining that the language of article I, section 8 is different and highly distinctive, the Court shortly concludes that the test for reviewing gag orders under that provision is one which happens to be identical to the test under the First Amendment. The Court follows this analysis with a lengthy apologia and accolade for its new method.

The Court's approach to this case, it seems to me, is contrived and unnecessarily extreme. The Court goes to great lengths to decide this case on our state constitution alone, even though the result would be the same under the First Amendment, for the same reasons. Although a state constitutional provision should not be ignored simply because it has a federal analogue, I think the converse is equally true: federal constitutional law should not be ignored simply because there exists a related state constitutional provision. Where, as here, the issue raised can be resolved on First Amendment grounds entirely consistent with the Texas Constitution, there is every reason to do so. What reasons the Court may have for avoiding this straightforward course is a question to which I shall return.

## A

The pending litigation involves claims by over 200 children and their parents for injuries due to exposure to toxic chemicals. The parents settled their claims five years ago, and defendants have proposed to settle the children's claims, subject to the district court's approval. Relator, the guardian ad litem for the children, opposes the settlement.[1] At a hearing on the proposed settlement on August 23, 1991, the district court apparently became concerned that differences and misunderstandings among the participants in the litigation threatened the proposed settlement and the best interests of the minor plaintiffs. Without a request from any party, the district court

---

1. The guardian proposed an alternative structure to the settlement that called for creation of a trust over which the guardian would act as trustee for a fee $200 per hour. The guardian requested payment of $879,351.03 for her servic-es for the preceding eighteen months and expenses and $294,592.00 for her future services. The court determined that the guardian's opposition to the proposed settlement was not in the children's best interest.

issued the first of two gag orders, orally instructing plaintiffs and defendants, their counsel, and relator not to discuss the case outside the courtroom. The court also "abated" relator's appointment as guardian ad litem and directed her to have no contact with plaintiffs pending further order of the court. Several days later, on September 11, the district court committed its order to writing, explaining the reasons for its issuance. This second, written, order stated in substance:

> BE IT REMEMBERED THAT ON THE 23RD DAY OF AUGUST, 1991, at a hearing in these consolidated cases, counsel for Plaintiffs, counsel for Defendant, and the then Guardian ad Litem were present.

> Upon hearing evidence that conflicts between counsel and the parents of the minor children were resulting in miscommunications with the parents of the children and with the media and general public, this Court, on its own motion, issued a protective order in the best interest of the minor children of this suit. In so doing, the Court found there was a need for such an extraordinary remedy and ORDERED counsel as follows:

> Counsel in this case, present and former, are expressly ORDERED to refrain from discussing or publishing in writing or otherwise, any matters of this case with any persons other than their clients, agents, or employees in the necessary course of business in this case.

> Counsel is ORDERED to refrain from any public comment, casual or otherwise concerning the facts of this case or the conduct of counsel in this case other than in a court hearing.

> Counsel is ORDERED to inform their clients, witnesses, agents and representatives that this ORDER extends to each of them and is subject to a finding of contempt by this court from disobedience, direct or indirect comment intended to violate this ORDER. Counsel was and is directed to communicate with their clients only, and advise each that they are directed to refrain from discussing the case except with counsel.

> At that hearing, the Court abated the appointment of the Guardian ad Litem until further Order of this Court, but specifically applied this protective order to the Guardian and that during the abatement, the Guardian was to have no contact with Plaintiffs. On September 11, 1991, the Court dismissed the Guardian Ad Litem from this Cause, but not from this Order.

> This Order was rendered in open court on the 23 of August, 1991 and is effective as of that date.

> The Court ORDERS the Clerk of this Court to prepare certified copies of this order for counsel and to convey immediately by telecopier the contents of this written order.

This order prohibits relator from discussing the pending litigation with anyone, ever, except in a hearing before the court, even though she has been dismissed as guardian ad litem in the case. The order even prohibits the parties from communicating with each other, although they do not complain of this prohibition here. The order is, in its own words, "an extraordinary remedy".

Relator complains that the gag orders infringe unlawfully upon her right to freedom of speech under the First Amendment to the United States Constitution. The United States Supreme Court has had several occasions to consider the validity of gag orders in criminal cases. *Gentile v. State Bar of Nevada*, —— U.S. ——, 111 S.Ct. 2720, 115 L.Ed.2d 888 (1991); *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 96 S.Ct. 2791, 49 L.Ed.2d 683 (1976); *Sheppard v. Maxwell*, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966); *In re Sawyer*, 360 U.S. 622, 79 S.Ct. 1376, 3 L.Ed.2d 1473 (1959). The principal authority applying the First Amendment to gag orders on the participants in a civil case, however, is *Bernard v. Gulf Oil Co.*, 619 F.2d 459, 467 (5th Cir.1980) (en banc), *aff'd on other grounds*, 452 U.S. 89, 101 S.Ct. 2193, 68 L.Ed.2d 693 (1981), in which the court held that an order restricting the named plaintiffs in a class action and their attorneys from communicating freely with prospective class members violated the First Amendment. The court determined that

such gag orders are prior restraints upon free speech. *Id.* at 467.[2] *See also Rodgers v. U.S. Steel Corp.*, 508 F.2d 152, 162–63 (3d Cir.), *cert. denied*, 423 U.S. 832, 96 S.Ct. 54, 46 L.Ed.2d 50 (1975).

> Prior restraints on freedom of speech have long been disfavored in American law. *Near v. Minnesota*, [283 U.S. 697, 51 S.Ct. 625, 75 L.Ed. 1357 (1931)]. While a prior restraint is not unconstitutional per se, there is a heavy presumption against its constitutionality. *Southeastern Promotions, Ltd. v. Conrad*, [420 U.S. 546, 558–59, 95 S.Ct. 1239, 1246–47, 43 L.Ed.2d 448 (1975)]; *Organization for a Better Austin v. Keefe*, [402 U.S. 415, 419, 91 S.Ct. 1575, 1577, 29 L.Ed.2d 1 (1971)].

*Bernard*, 619 F.2d at 467. Generally, "prior restraints on speech and publication are the most serious and the least tolerable infringement on First Amendment rights." *Nebraska Press*, 427 U.S. at 559, 96 S.Ct. at 2803 (1976).

For a prior restraint to violate the First Amendment, it must prohibit protected activity. "The First Amendment is not absolute, and 'the protection even as to previous restraint is not absolutely unlimited.'" *Bernard*, 619 F.2d at 471 (quoting *Near*, 283 U.S. at 716, 51 S.Ct. at 631); *accord Nebraska Press*, 427 U.S. at 570, 96 S.Ct. at 2808; *Times Film Corp. v. Chicago*, 365 U.S. 43, 47, 81 S.Ct. 391, 393, 5 L.Ed.2d 403 (1961); *Kingsley Books, Inc. v. Brown*, 354 U.S. 436, 441, 77 S.Ct. 1325, 1327–28, 1 L.Ed.2d 1469 (1957). Exceptions include speech that is obscene, seditious or extremely provocative. *Nebraska Press*, 427 U.S. at 590, 96 S.Ct. at 2817 (Brennan, J., concurring). It is unnecessary to decide whether there is some activity prohibited by the gag orders in this case which is not protected by the First Amendment, such as, perhaps, intimidation of the minor plaintiffs. These orders sweep far more broadly, prohibiting relator from speaking at all on any matter concerning the litigation. Beyond question, her First Amendment rights are affected.

According to *Bernard*, a gag order is permitted by the First Amendment only if it meets three conditions. First, "'before a prior restraint may be imposed by a judge, even in the interest of assuring a fair trial, there must be "an imminent, not merely a likely, threat to the administration of justice. The danger must not be remote or even probable; it must immediately imperil."'" *Bernard*, 619 F.2d at 474 (quoting *United States v. Columbia Broadcasting System, Inc.*, 497 F.2d 102, 104 (5th Cir. 1974) (quoting *Craig v. Harney*, 331 U.S. 367, 376, 67 S.Ct. 1249, 1255, 91 L.Ed. 1546 (1947))). "In general, a prior restraint may be justified only if the expression sought to be restrained 'surely [will] result in direct, immediate, and irreparable damage.'" *Bernard*, 619 F.2d at 473 (quoting *International Soc'y for Krishna Consciousness v. Eaves*, 601 F.2d 809, 833 (5th Cir.1979) (quoting *New York Times Co. v. United States*, 403 U.S. 713, 730, 91 S.Ct. 2140, 2149, 29 L.Ed.2d 822 (1971) (Stewart, J., joined by White, J., concurring))). Even "'the interest of the judiciary in the proper administration of justice does not authorize any blanket exception to the first amendment.'" *Bernard*, 619 F.2d at 467 n. 8 (quoting *Rodgers*, 508 F.2d at 163); *see Wood v. Georgia*, 370 U.S. 375, 395, 82 S.Ct. 1364, 1375, 8 L.Ed.2d 569 (1962); *Craig*, 331 U.S. at 378, 67 S.Ct. at 1256; *Pennekamp v. Florida*, 328 U.S. 331, 347, 349–50, 66 S.Ct. 1029, 1037, 1038–39, 90 L.Ed. 1295 (1946); *Bridges v. California*, 314 U.S. 252, 272–73, 62 S.Ct. 190, 198–99, 86 L.Ed. 192 (1941). Second, a valid prior restraint "must not sweep too broadly. Rather it 'must be narrowly drawn and

---

**2.** The Court states that there is a confusing split of federal authority on this matter, citing three cases: *In re Dow Jones & Co., Inc.*, 842 F.2d 603, 608–610 (2d Cir.), *cert. denied sub nom. Dow Jones & Co., Inc. v. Simon*, 488 U.S. 946, 109 S.Ct. 377, 102 L.Ed.2d 365 (1988); *Journal Publ. Co. v. Mechem*, 801 F.2d 1233, 1236 (10th Cir. 1986) (holding to the contrary); *In re Russell*, 726 F.2d 1007, 1010 (4th Cir.), *cert. denied sub nom. Russell v. Flannery*, 469 U.S. 837, 105 S.Ct. 134, 83 L.Ed.2d 74 (1984). None of these cases is apposite here. *Dow Jones* and *Russell* were criminal cases, in which the use of gag orders involves different considerations, as explained in *Nebraska Press*. The complaints in *Dow Jones* and *Mechem* were not by persons subject to gag orders but by members of the press, also involving different considerations.

cannot be upheld if reasonable alternatives are available having a lesser impact on First Amendment freedoms.'" *Bernard,* 619 F.2d at 476 (quoting *CBS, Inc. v. Young,* 522 F.2d 234, 238 (6th Cir.1975)); *see also Nebraska Press,* 427 U.S. at 562–69, 96 S.Ct. at 2804–08; *Carroll v. Commissioners of Princess Anne,* 393 U.S. 175, 183–84, 89 S.Ct. 347, 352–53, 21 L.Ed.2d 325 (1968). Third, "the restraint 'must have been accomplished with procedural safeguards that reduce the danger of suppressing constitutionally protected speech.'" *Bernard,* 619 F.2d at 477 (quoting *Southeastern Promotions,* 420 U.S. at 559, 95 S.Ct. at 1246). These safeguards include evidence and findings. *See Nebraska Press,* 427 U.S. at 564, 96 S.Ct. at 2805.

The district court's gag orders do not meet First Amendment standards. The orders were not necessitated by any imminent threat imperiling the administration of justice. The meager record before us shows that the district court was concerned that conflicts among the various participants in this litigation were resulting in misstatements and misunderstandings, jeopardizing a proposed settlement and what the court considered to be the best interests of the minor plaintiffs. The existence of those conflicts was apparent from oral argument before this Court. Relator stated quite clearly that as former guardian ad litem she had and still has very strong views about the children's interests. The district court clearly believed that the plaintiffs needed to be protected from relator's insistence on expressing her views, and the other parties appear to share the court's view, joining in defense of the gag orders which they are themselves subject to. As far removed from the conduct of the litigation as we are, it is difficult to evaluate the district court's concerns. As-

suming, however, that relator was every bit the threat to her previous wards that the district court considered her to be, that threat did not impinge so imminently upon the administration of justice as to satisfy the first condition of *Bernard.*

Moreover, the orders were overly broad and were not the only reasonable alternative for addressing the problems the district court confronted. The district court prohibited relator from talking with anyone about the case under any circumstances except in the course of proceedings. This order is far more expansive than the order struck down in *Bernard;* it does not merely limit relator's communications about the case, it prohibits them altogether outside the courtroom. Although the district court in this case met with the parties in an effort to dispel confusion, and although it cautioned relator against causing further conflicts and misunderstandings, it did not reasonably exhaust these efforts or explore the use of disciplinary measures[3] or sanctions against relator before drastically restricting her fundamental rights. Removing relator as guardian ad litem might alone have alleviated the conflicts. The district court neither exhausted reasonable alternative measures nor limited its prohibition to what was necessary to accomplish its purposes. Thus the gag orders cannot meet *Bernard*'s second condition.

Finally, the district court did not follow procedures that would safeguard against an unwarranted infringement of relator's First Amendment rights. The district court acted on its own, without motion or argument from the parties. Although the district court conducted an evidentiary hearing at some point prior to issuing its first order, the record does not reflect whether any of that evidence pertained to the necessity and scope of a gag order.

---

**3.** Rule 3.07(a) of the Texas Disciplinary Rules of Professional Conduct states: "In the course of representing a client, a lawyer shall not make an extrajudicial statement that a reasonable person would expect to be disseminated by means of public communication if the lawyer knows or reasonably should know that it will have a substantial likelihood of materially prejudicing an adjudicatory proceeding. A lawyer shall not counsel or assist another person to make such a

statement." SUPREME COURT OF TEXAS, TEXAS DISCIPLINARY RULES OF PROFESSIONAL CONDUCT, TEX. GOV'T CODE tit. 2, subtit. G—App. A, art. 10, § 9, Rule 3.07.

I do not suggest that relator should be disciplined, only that the rules of professional conduct address the propriety of attorneys' extrajudicial statements during pending litigation. *Cf. Gentile v. State Bar of Nevada,* —— U.S. ——, 111 S.Ct. 2720, 115 L.Ed.2d 888 (1991).

The orders come to this Court supported by a single, general finding recited in the written order. These procedures do not comport with those required by *Bernard*'s third condition.

*Bernard* does not hold that participants in civil court proceedings have a boundless constitutional right to speak extrajudicially about the litigation, or that a court is powerless to limit such speech in all circumstances. It does, however, set a high standard for any such limitation in recognition of the importance of free speech rights of attorneys and litigants. The issuance of gag orders in these circumstances did not meet this standard and therefore was an unlawful infringement upon relator's constitutionally protected freedom of speech and a clear abuse of discretion. Relator has no right to appeal these interlocutory orders until final judgment is rendered and meanwhile must suffer their irreversible and irrecompensable effects. She is therefore entitled to mandamus relief, which we have already granted, directing the district court to vacate the gag orders.

**B**

The Court reaches this result but not by the well-traveled road of First Amendment jurisprudence. It insists instead on traversing the largely uncharted terrain of article I, section 8 of the Texas Constitution.

**1**

I say "insists" because the idea that this case should be decided on state constitu-

tional grounds alone did not originate with the parties but with one Member of this Court. Article I, section 8 was not even mentioned in this case until relator's counsel alluded to it in passing in oral argument, after which the following colloquy occurred:

JUSTICE DOGGETT: Are you asserting—you made reference to the Texas Constitution earlier—are you asserting free speech rights under the Texas Constitution as well as the U.S. Constitution?

RELATOR'S COUNSEL: That is correct, Your Honor. I read article I, section 8 of the Texas Constitution as going beyond the First Amendment.

JUSTICE DOGGETT: Have you briefed that and cited us any authority on the broader protections afforded by the Texas Constitution?

RELATOR'S COUNSEL: No, we haven't, Your Honor. I entered this case after the briefing was terminated.

JUSTICE DOGGETT: Are you interested in filing any supplemental briefing on that issue?

RELATOR'S COUNSEL: We would welcome the opportunity to file supplemental briefing with this Court on the First Amendment issues.

There was no further discussion of article I, section 8 during oral argument. Relator subsequently filed a supplemental brief arguing that the gag orders were not permitted by the First Amendment, and secondarily, that article I, section 8 provides an independent basis for overturning them. Respondent never replied to this brief.[4]

---

4. Until encouraged at oral argument to raise state constitutional claims, relator centered her contentions on the First Amendment and mentioned the Texas Constitution only once. That single reference occurs in her original brief, where she stated that the gag orders "cannot withstand State or Federal Constitutional scrutiny." Relator never cited article I, section 8, or any case construing it.

To evade this fact, the Court states that this opinion's description of the record is a "selective presentation" which "overlooks" that some of the papers relator filed in this proceeding "encompassed" state constitutional claims, and cites three references. *Ante*, at 23 n. 68. One of them, relator's second request for emergency interim relief, was filed after oral argument,

when relator had been urged to raise a state claim. Another, relator's original petition in this Court, states only that the gag orders "violate[ ] her own Constitutional rights", without mentioning the Texas Constitution. The last reference is to relator's brief, which I have quoted above. About the most that can be said is that the contentions relator made in the papers filed before oral argument are not inconsistent with a claim under the Texas Constitution.

Apart from the colloquy quoted, the Texas Constitution was referred to at oral argument exactly three times, twice by relator's counsel, and then once by counsel for some of the real parties in interest, as follows:

"The gag order goes far beyond any of the well established principles established by this

Thus, in considering the applicability of article I, section 8 to this case, the Court has the benefit of no argument and approximately four pages of briefing which relator filed at the invitation of one Justice.[5] The Court may choose to rest a significant decision on grounds which the parties have not fully presented, but there are always risks in doing so, and the more important the issue, the greater the risks. The validity of prior restraints under article I, section 8, independent of First Amendment law and any law in other states, is a very important issue. Had it been fully presented by the parties, and had our understanding of this provision of our constitution grown and developed over time, the issue might be addressed with more assurance. Today, however, Texas prior restraint law is born a teenager, a process as remarkable as it is frightful.

### 2

Article I, section 8 of the Texas Constitution states in pertinent part:

> Every person shall be at liberty to speak, write or publish his opinions on any subject, being responsible for the abuse of that privilege; and no law shall ever be passed curtailing the liberty of speech or of the press.

This provision in our state Bill of Rights, like the First Amendment to the United States Constitution and similar provisions in the constitutions of other states, enshrines and protects a fundamental right long treasured by the people of this nation, the right of free speech. That right, however, is not absolute, as we long ago learned in our thinking about the First Amendment. Justice Holmes' classic example, familiar to lawyers and non-lawyers alike, is that one does not have the right of "falsely shouting fire in a theatre and causing a panic." *Schenck v. United States,* 249 U.S. 47, 52, 39 S.Ct. 247, 249, 63 L.Ed. 470 (1919). Free speech can be abused, as article I, section 8 expressly recognizes, and responsibility for that abuse is not only consistent with protecting the freedom, it is part of the freedom itself.

Freedom and responsibility have a symbiotic relationship: they are part of one another, yet in tension. So here, relator contends that she should be free to communicate with the parties to this litigation, and the district court counters that relator's freedom should be restricted because of her responsibility not to cause misunderstandings which threaten the best interests of the minor plaintiffs. Article I, section 8 provides principles for resolving this dispute, but it does not prescribe the resolution. It falls to the Court to determine how these governing principles apply in specific situations. To make this determination we ordinarily look to such things as the language of the constitutional provision itself, its purpose, the historical context in which it was written, the intentions of the framers, the application in prior judicial decisions, the relation of the provision to the law as a whole, the understanding of other branches of government, the law in other jurisdictions, state and federal, constitutional and legal theory, and fundamental values including justice and social policy. *See, e.g., Brown v. Meyer,* 787 S.W.2d 42, 45 (Tex.1990); *Edgewood Indep. Sch. Dist. v. Kirby,* 777 S.W.2d 391, 394 (Tex. 1989); *State v. Project Principle, Inc.,* 724 S.W.2d 387, 390–91 (Tex.1987); *Spring Branch Indep. Sch. Dist. v. Stamos,* 695 S.W.2d 556, 559–62 (Tex.1985); *City of El Paso v. El Paso Community College Dist.,* 729 S.W.2d 296, 298 (Tex.1986); *Tarrant County v. Ashmore,* 635 S.W.2d 417, 420–

---

Court under article I, section 8 of the Texas Constitution, and the First Amendment, and the decisions of the U.S. Supreme Court implementing it."

"And what the First Amendment teaches us and what the Texas Constitution says even more for us is you let the speaker speak at his or her peril."

"I think that in terms of the Texas Constitution and the U.S. Constitution that there are cases and instances in which a judge in the course of a trial can say, "I don't want y'all talking to the newspapers."

**5.** The Court correctly states that the parties have not devoted much more attention to First Amendment arguments and did not cite *Bernard* before oral argument. *Ante,* at 23 n. 68. The fact remains that the parties' free speech contentions and arguments have focused on the First Amendment, not article I, section 8.

23 (Tex.1982); *Gragg v. Cayuga Indep. Sch. Dist.*, 539 S.W.2d 861, 865–66 (Tex.), *appeal dismissed*, 429 U.S. 973, 97 S.Ct. 478, 50 L.Ed.2d 581 (1976); *Ex parte Werblud*, 536 S.W.2d 542, 544–48 (Tex.1976); *Harris v. City of Fort Worth*, 142 Tex. 600, 180 S.W.2d 131, 133 (1944); *Jones v. Ross*, 141 Tex. 415, 173 S.W.2d 1022, 1024 (1943); *Collingsworth County v. Allred*, 120 Tex. 473, 40 S.W.2d 13, 15 (1931); *see also Dir. of the Dep't of Agric. and Env't v. Printing Indus. Ass'n*, 600 S.W.2d 264, 267 (Tex.1980); *Travelers' Ins. Co. v. Marshall*, 124 Tex. 45, 76 S.W.2d 1007, 1012–25 (1934); *Mellinger v. City of Houston*, 68 Tex. 37, 3 S.W. 249, 252–54 (1887).[6]

In applying article I, section 8 to the gag orders here, the Court attempts to follow this process as it ordinarily would, except that, consistent with its new approach, it expressly refuses to consider whether the orders violate the First Amendment. The Court tries to prove that article I, section 8 can be construed and applied completely independently of the First Amendment. To do this, the Court examines the history of article I, section 8, its text, and caselaw construing it. Its analysis of each of these three areas is seriously deficient, as I shall show before reviewing the Court's conclusions.

3

The Court recites a little history: that Stephen F. Austin was jailed and Lorenzo de Zavala hunted down for being outspoken; that provisions guaranteeing free speech were included in the first proposed Texas Constitution in 1833 and the constitutions of 1836, 1861, 1866, 1869 and 1876; that framers of these constitutions represented a "heterogenous miscellany of opinions" different from the framers of the U.S. Constitution; and that after debate at times vigorous on topics including secession, these framers rejected the free speech provision of the Tennessee Constitution, as well as a provision regarding speech injuri-

ous of female reputation libelous without regard to its truth and a provision conditioning free speech on good motives. The provision proposed for the Texas Constitution in 1833 stated:

> The free communication of thoughts and opinion, is one of the inviolable rights of man; and every person may freely speak, write, print, and publish, on any subject, being responsible for the abuse of that liberty. . . .

*Proposed Constitution for the State of Texas* (1833) art. 16, *reprinted in Documents of Texas History* 80 (Ernest Wallace ed. 1963). This earlier proposal was virtually identical to the Tennessee provision rejected in 1876 by the Texas framers, except only that the latter was limited to citizens. Tennessee's Constitution, first adopted in 1796, provides:

> The free communication of thoughts and opinions is one of the invaluable rights of man; and every citizen may freely speak, write, and print on any subject, being responsible for the abuse of that liberty.

TENN. CONST. art. XI, § 19 (1796) (reprinted in BENJAMIN PERLEY POORE, THE FEDERAL AND STATE CONSTITUTIONS, COLONIAL CHARTERS AND OTHER ORGANIC LAWS OF THE UNITED STATES, Vol. 1 & 2 (2d ed. 1878)). The other two provisions which the Texas framers rejected would have imposed significant limitations on the right of free speech.

These interesting but casual historical notes, which the Court optimistically calls a "rather extensive historical discussion", *ante*, at 22, indicate that free speech has always been very important in Texas, something I have never supposed was in dispute, but say nothing about how article I, section 8 applies to gag orders, or why. There is a reason for the Court's shallow approach: it does not intend to be bound to any historical interpretation. Historical analysis is "only a starting point", the Court says; "[i]n no way must our understanding of its guarantees be frozen in the

---

**6.** The Court is mistaken in its assertion that none of these cases recognizes federal law as a consideration in construing state constitutional provisions. *Ante*, at 22 n. 66. Six of them— *Project Principle, Spring Branch, Tarrant Coun-*

*ty, Werblud, Travelers,* and *Mellinger*—cite extensively to federal law in applying state constitutional provisions. This list is illustrative only, not exhaustive.

past." *Ante,* at 19. In other words, the Court does not accept the premise that the intent of the framers of the constitution governs its future construction. "[W]e use history," the Court explains, "to assist in an understanding of the generalities and ambiguities sometimes present in a constitution." *Ante,* at 19. If this is true, what "generalities and ambiguities" in article I, section 8 has the Court clarified by its observations about Stephen F. Austin and Lorenzo de Zavala, or any other aspect of its "rather extensive" historical discussion? I cannot find one.

4

The Court also examines the text of article I, section 8, pointing out the inescapable facts that the language is not identical to that of the First Amendment, that it is stated partly in the affirmative ("Every person shall be at liberty to speak") rather than entirely in the negative ("Congress shall make no law"), and that it appears toward the front of the constitution rather than at the end. These facts prove conclusively that the language of article I, section 8 is different from the First Amendment, something that is plain as day. The issue,

however, is not whether there are differences, but what, if anything, those differences mean, and the Court's observations shed no light on this issue. The Court cannot substantiate its claim that the framers of the Texas Constitution "explicitly rejected" verbatim adoption of the First Amendment of the U.S. Constitution, but even if it could, we would not know what the framers intended in so doing.[7]

The Court's contention that the language of article I, section 8 is "different" and "highly distinct" is misleading. Texas, like most states, appears to have derived its constitutional provision protecting the right to free speech from Blackstone, who articulated that right as follows: "Every freeman has an undoubted right to lay what sentiments he pleases before the public; to forbid this, is to destroy the freedom of the press: but if he publishes what is improper, mischievous, or illegal, he must take the consequences of his own temerity." 4 WILLIAM BLACKSTONE, COMMENTARIES 152. By 1833, when a constitution was first proposed for Texas, 15 of the 24 states then in the United States had constitutional provisions protecting free speech in words similar to Blackstone's.[8] The language pro-

7. Contrary to the Court's assertion, *ante,* at 8 n. 13, page 1, column 3 of the Oct. 13, 1875, edition of the *Galveston Daily News* does not "record[ ] the rejection" of First Amendment language.

8. ALA.CONST. art. I, § 8 (1819): "Every citizen may freely speak, write and publish his sentiments on all subjects, being responsible for the abuse of that liberty."

CONN.CONST. art. I, § 5 (1818): "Every citizen may freely speak, write and publish his sentiments on all subjects, being responsible for the abuse of that liberty."

DEL.CONST. art. I, § 5 (1831): "... any citizen may print on any subject, being responsible for the abuse of that liberty."

ILL.CONST. art. XIII, § 22 (1818): "The free communication of thoughts and opinions is one of the invaluable rights of man; and every citizen may freely speak, write, and print on any subject, being responsible for the abuse of that liberty."

IND.CONST. art. I, § 9 (1816): "The free communication of thoughts and opinions is one of the invaluable rights of man; and every citizen may freely and fully speak, write and print on any subject, being responsible for the abuse of that liberty."

KY.CONST. art. X, § 7 (1799): "The free communication of thoughts and opinions is one of the invaluable rights of man, and every citizen may freely and fully speak, write, and print on any subject, being responsible for the abuse of that liberty."

LA.CONST. art. VI, § 21 (1812): "The free communication of thoughts and opinions is one of the invaluable rights of man, and every citizen may freely speak, write, and print on any subject, being responsible for the abuse of that liberty."

ME.CONST. art. I, § 4 (1820): "Every citizen may freely speak, write, and publish his sentiments on any subject, being responsible for the abuse of this liberty."

MO.CONST. art. XIII, § 16 (1820): "That the free communication of thoughts and opinions is one of the invaluable rights of man, and that every person may freely speak, write, and print on any subject, being responsible for the abuse of that liberty...."

N.Y.CONST. art. VII, § 8 (1821): "Every citizen may freely speak, write, and publish his sentiments on all subjects, being responsible for the abuse of that right...."

OHIO CONST. art. VIII, § 6 (1802): "Every citizen has an indisputable right to speak, write, or

posed for Texas' constitution in 1833, and the language incorporated in the 1876 constitution, are obviously related to Blackstone's formulation of the common law, and are strikingly similar to the provisions of what were then almost two-thirds of the state constitutions except in one respect: the language of our 1876 constitution, unlike the language proposed in 1833, extended freedom of speech to persons instead of citizens. Even in this respect, however, Texas was neither unique nor first: Missouri had already adopted such a provision. *Supra* note 8.

The close relationship between the free speech guarantees in the constitutions of Texas and many other states should not be surprising. The idea that freedom of speech is a fundamental right is not unique to Texas or any other state, but one inherent in our political structure and shared generally by the people of this nation. While the right has been described in somewhat different words at different times and places, the basic ideas certainly transcend state lines. Free speech is a national idea, not only a Texas idea. The Court's attempt to distinguish Texas free speech as significantly different from First Amendment free speech—and presumably also from New York free speech or California free speech—is not supported by the texts of the various guarantees.

5

The only serious effort the Court makes to determine how article I, section 8 should apply to gag orders is by examining our own precedents, and this effort, though flawed, is exhaustive. For it should be noted that in more than 150 years article I, section 8 has been *mentioned* in this Court's opinions in only 19 cases, and twice the reference was in a separate opinion.[9] In only five of these 19 cases has this Court written more than a few words about article I, section 8, and only three of those five involved prior restraints. Two of the three prior restraint cases relied entirely on the third, *Ex parte Tucker*, 110 Tex. 335, 220 S.W. 75 (1920). This is the totality of our prior restraint jurisprudence under the Texas Constitution.

print upon any subject as he thinks proper, being liable for the abuse of that liberty."

PA. CONST. art. IX, § 7 (1790): "The free communication of thoughts and opinions is one of the invaluable rights of man, and every citizen may freely speak, write, and print on any subject, being responsible for the abuse of that liberty."

TENN. CONST. art. XI, § 19 (1796): "The free communication of thoughts and opinions is one of the invaluable rights of man; and every citizen may freely speak, write, and print on any subject, being responsible for the abuse of that liberty."

*See* BENJAMIN PERLEY POORE, THE FEDERAL AND STATE CONSTITUTIONS, COLONIAL CHARTERS AND OTHER ORGANIC LAWS OF THE UNITED STATES, Vol. 1 & 2 (2d ed. 1878).

9. *Casso v. Brand*, 776 S.W.2d 551, 556 (Tex. 1989); *O'Quinn v. State Bar of Texas*, 763 S.W.2d 397, 402 (Tex.1988); *Channel 4, KGBT v. Briggs*, 759 S.W.2d 939, 944 (Tex.1988) (GONZALEZ, J., concurring); *Texas State Employees Union v. Texas Dep't of Mental Health & Mental Retardation*, 746 S.W.2d 203, 205 (Tex.1987) (provision neither applied nor discussed); *Ex parte Price*, 741 S.W.2d 366, 369 (Tex.1987) (GONZALEZ, J., concurring); *LeCroy v. Hanlon*, 713 S.W.2d 335, 338 (Tex.1986) (provision neither applied nor discussed); *Hajek v. Bill Mowbray Motors, Inc.*, 647 S.W.2d 253, 255 (Tex.1983) (per curiam) (provision held violated without discussion, citing *Tucker*); *Ex parte Pruitt*, 551 S.W.2d 706, 710 (Tex.1977) (provision neither applied nor discussed); *Houston Chronicle Publ. Co. v. City of Houston*, 536 S.W.2d 559, 561 (Tex.1976) (provision held not violated without discussion); *City of Fort Worth v. Craik*, 411 S.W.2d 541, 542–543 (Tex.1967) (provision neither applied nor discussed); *Ex parte Jimenez*, 159 Tex. 183, 317 S.W.2d 189, 194 (1958) (provision held not violated without discussion); *Ex parte Twedell*, 158 Tex. 214, 309 S.W.2d 834, 839 (1958) (provision neither applied nor discussed); *Dallas General Drivers v. Wamix, Inc.*, 156 Tex. 408, 295 S.W.2d 873, 879–880 (1956) (provision held violated based upon *Tucker* without further discussion); *Best Motor Lines v. International Bhd. of Teamsters*, 150 Tex. 95, 237 S.W.2d 589, 592 (1951) (provision mentioned only in defendant's answer with no application or discussion); *Ex parte Thomas*, 141 Tex. 591, 174 S.W.2d 958, 960–961 (1943), *rev'd sub nom. Thomas v. Collins*, 323 U.S. 516, 65 S.Ct. 315, 89 L.Ed. 430 (1945) (provision held not violated without discussion); *Travelers' Ins. Co. v. Marshall*, 124 Tex. 45, 76 S.W.2d 1007, 1010 (1934) (provision only mentioned and not applied); *Ex parte Tucker*, 220 S.W. 75, 76 (Tex.1920); *St. Louis Southwestern Ry. v. Griffin*, 106 Tex. 477, 171 S.W. 703, 705 (1914); *St. Louis Southwestern Ry. v. Hixon*, 104 Tex. 267, 137 S.W. 343, 344–345 (1911) (provision neither applied nor discussed).

*Tucker,* decided before the First Amendment was applied to the states through the Fourteenth Amendment in *Gitlow v. New York,* 268 U.S. 652, 45 S.Ct. 625, 69 L.Ed. 1138 (1925), held that an injunction prohibiting union employees from " 'vilifying, abusing, or using opprobrious epithets to' " other employees violated article I, section 8. *Tucker,* 220 S.W. at 75. The Court cites *Tucker* and quotes from it extensively as an example of the independence of article I, section 8 from the First Amendment. But the Court does not quote the following:

> The experience of the English nation and some of the American colonies under the tyranny of such systems is the reason this provision in the Bill of Rights [article I, section 8] is one common to the Constitutions of the American States, and for its incorporation, *in like words,* in the First Amendment to the Federal Constitution.

*Id.* at 76 (emphasis added). *Tucker* did not ignore the First Amendment in its analysis of article I, section 8, as the Court has, nor did it differentiate the two provisions, as the Court attempts to do today. Rather, it linked them in two respects: they were founded on common experience, that of the English nation and the American colonies, and they were framed in "like words".

The other two cases which utilize article I, section 8 to invalidate prior restraints rely entirely upon *Tucker.* In *Dallas General Drivers v. Wamix, Inc.,* 156 Tex. 408, 295 S.W.2d 873, 879 (Tex.1956), the Court dissolved an injunction prohibiting striking employees from "us[ing] ... insulting, threatening and indecent language" toward non-striking employees "without prejudice to the right of the trial court to reinstate it if future conduct of the [striking employees] should authorize it." Thus, the Court invalidated an injunction as a prior restraint but did not preclude the trial court from reissuing it if the circumstances warranted. This is certainly not a very broad reading of article I, section 8, and may well be narrower than the First Amendment. In *Hajek v. Bill Mowbray Motors, Inc.,* 647 S.W.2d 253, 255 (Tex.1983) (per curiam), the Court dissolved an injunction prohibiting an owner from driving his car on which he had

prominently labeled as a "lemon". Although the Court did not refer to the First Amendment, it also did not state that article I, section 8 afforded broader protection of speech.

Thus, all three of this Court's prior restraint cases have at least assumed a congruence between article I, section 8 and the First Amendment. The other two decisions of this Court in which article I, section 8 is discussed at all are *Casso v. Brand,* 776 S.W.2d 551, 556 (Tex.1989), and *O'Quinn v. State Bar of Texas,* 763 S.W.2d 397, 402 (Tex.1988). The Court quotes *Casso* as stating that "our state free speech guarantee may be broader than the corresponding federal guarantee". *Ante,* at 9. What *Casso* actually said was:

> While we have recently recognized the *possibility* that our state free speech guarantee may be broader than the corresponding federal guarantee, *see O'Quinn v. State Bar,* 763 S.W.2d 397, 402 (Tex.1988), that broader protection, *if any,* cannot come at the expense of a defamation claimant's right to redress. Unlike the United States Constitution, which contains no explicit guarantee of the right to sue for defamation, the Texas Constitution expressly protects the bringing of reputational torts....
>
> These provisions must be given effect. While we may on occasion grant protections to defamation defendants beyond those required in the United States Constitution, as we have today in requiring public official and public figure plaintiffs to prove their actions against private defendants under the *New York Times [Co. v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964)] standard, *we have based those decisions on common law, not constitutional grounds.*

*Casso,* 776 S.W.2d at 556 (emphasis added). The Court's quote is somewhat misleading. While *Casso* admits the "possibility" that article I, section 8 may contain a broader guarantee of free speech than the First Amendment, it also recognizes that the state provision expressly imposes responsibility for abusive speech, something which the First Amendment does not do. On the

whole, *Casso* not only fails to lend the Court's position support, it undercuts it. The Court also quotes *O'Quinn* as stating, " 'Texas' free speech right [has been characterized] as broader than its federal equivalent' ". *Ante*, at 8. What the Court actually said was: "*One commentator* has characterized Texas' free speech right as being broader than its federal equivalent...." *O'Quinn*, 763 S.W.2d at 402 (emphasis added). *O'Quinn* does not claim that a broader view of article I, section 8 is as widely held as the Court would suggest. Nor did the Court in *O'Quinn* embrace the view, adding: "We need not decide at this time whether Texas' guarantee of free speech affords greater protection than its corresponding federal rights...." *Id.*

These five decisions, *Tucker, Dallas General, Hajek, Casso* and *O'Quinn*, constitute the entirety of our article I, section 8 caselaw. As if they were hardly sufficient foundation for a rule governing gag orders, the Court also cites two court of appeals decisions, *Amalgamated Meat Cut. v. Carl's Meat & Provision Co.*, 475 S.W.2d 300, 304 (Tex.Civ.App.—Beaumont 1971, writ dism'd w.o.j.), and *Pirmantgen v. Feminelli*, 745 S.W.2d 576, 578 (Tex. App.—Corpus Christi 1988, no writ), cases based upon both the federal and state provisions. Contrary to the Court's new approach in this case, both these cases rely in part upon the First Amendment. The last time this Court addressed a prior restraint was in *Iranian Muslim Org. v. City of San Antonio*, 615 S.W.2d 202 (Tex.1981), where we invalidated the restraint based solely upon the First Amendment without alluding to article I, section 8. The Court does not cite *Iranian*. Two court of appeals decisions which the Court also does not cite expressly hold that "Texas constitutional provisions guaranteeing freedom of expression and assembly are coextensive with the corresponding federal guarantees". *Puckett v. State*, 801 S.W.2d 188, 192 (Tex.App.—Houston [14th Dist.] 1990), *cert. denied*, —— U.S. ——, 112 S.Ct. 606, 116 L.Ed.2d 629 (1991); *Reed v. State*, 762 S.W.2d 640, 644 (Tex.App.—Texarkana 1988, pet. ref'd), *cert. denied*, 493 U.S. 822, 110 S.Ct. 81, 107 L.Ed.2d 47 (1989). *Reed*

adds, "and we will apply the same analysis and principles of construction in interpreting them." *Id.*

Finally, the Court refers to two opinions of our Court of Criminal Appeals, both of which held that newspaper publishers could not be held in contempt for publishing criminal trial testimony in violation of a court order. Both decisions were based upon article I, section 8. However, *Ex parte Foster*, 44 Tex.Cr.R. 423, 71 S.W. 593 (App.1903), *disapproved on other grounds in Ex parte Winfree*, 153 Tex. 12, 263 S.W.2d 154, 158 (1953), like *Tucker*, was decided before the First Amendment was applied to the states. And *Ex parte McCormick*, 129 Tex.Cr.R. 457, 88 S.W.2d 104, 106 (App.1935), relied upon both federal and state caselaw, and observed that the guaranty of article I, section 8 is also embodied in state constitutions and in the First Amendment. Neither case follows the Court's approach in this case of ignoring First Amendment law, and neither distinguishes article I, section 8 from the First Amendment.

The truth of the matter is that all our prior caselaw either assumes a close identity between the First Amendment and article I, section 8, or is silent on the subject. Not before today has this Court insisted that the two provisions are different in substance, and so much so that we should not even consider the former in construing the latter.

6

It is important to note that the Court does not tie its analysis of the gag orders in this case to the history of article I, section 8, or to its text, or to any prior caselaw. Rather, it states: "Since the dimensions of our constitutionally guaranteed liberties are continually evolving, today we build on our prior decisions by affirming that a prior restraint on expression is presumptively unconstitutional." *Ante*, at 10. By "continually evolving", the Court means that it is free to construe our constitution unconstrained by its history or any prior construction. "With this concept in mind," the Court adopts a test

for determining whether gag orders are valid under article I, section 8, the basis for which cannot be found in any kind of precedent that the Court recognizes. That test is as follows:

> a gag order in civil judicial proceedings will withstand constitutional scrutiny only where there are specific findings supported by evidence that (1) an imminent and irreparable harm to the judicial process will deprive litigants of a just resolution of their dispute, and (2) the judicial action represents the least restrictive means to prevent that harm.

*Ante,* at 10.

In deciding upon this test, the Court states that its analysis has been assisted by federal cases, and it cites two: *Nebraska Press* and *Bernard.* The Court criticizes both, although they both struck down the gag orders involved. *Nebraska Press,* it says, is a "fact specific" and "splintered" decision, *ante,* at 10, which is "too permissive", *ante,* at 11, and "does not ... sufficiently protect the rights of free expression that we believe that the fundamental law of our state secures", *ante,* at 10. The Court does not explain how *Nebraska Press* is any more fact specific than this case, or how it leaves fundamental rights unguarded. *Bernard,* the Court says, was decided "in the context of Rule 23(d) of the Federal Rules of Civil Procedure", *ante,* at 10 n. 16, "on a very splintered vote, and thereafter disregarded by the United States Supreme Court", *ante,* at 21, showing "[i]f anything, the admittedly unsettled nature of the federal law", *ante,* at 10 n. 16. The truth is, that while *Bernard* involved federal rule 23, it was decided on First Amendment grounds; that the "very splintered vote" was thirteen judges for the court's opinion, eight concurring, and one dissenting—not too different from our vote in this case; and that the U.S. Supreme Court affirmed the judgment of the Fifth Circuit without reaching the First Amendment issues. As for whether federal law is "admittedly unsettled", *Bernard* simply assembles and restates the holdings of a number of U.S. Supreme Court decisions in fashioning a test for gag orders.

As flawed as the Court considers *Nebraska Press* and *Bernard* to be, it is difficult to conceive how the Court can state a test for gag orders under article I, section 8 that is identical to *Bernard's* First Amendment standards. The presumption against the constitutionality of gag orders is the same. The first element of the Court's test—"an imminent and irreparable harm to the judicial process [that] will deprive litigants of a just resolution of their dispute"—is the same as *Bernard's*—"an imminent, not merely a likely, threat to the administration of justice", 619 F.2d at 474 (quoting *U.S. v. Columbia Broadcasting System, Inc.,* 497 F.2d 102, 104 (5th Cir. 1974)), that "surely [will] result in direct, immediate, and irreparable damage", 619 F.2d at 473 (quoting *International Soc'y for Krishna Consciousness,* 601 F.2d at 833 (quoting *New York Times,* 403 U.S. at 730, 91 S.Ct. at 2149)). The second element of the Court's test—"the judicial action represents the least restrictive means to prevent that harm"—is also the same as *Bernard's*—the gag order " 'must be narrowly drawn and cannot be upheld if reasonable alternatives are available having a lesser impact on First Amendment freedoms' ", 619 F.2d at 476 (quoting *CBS,* 522 F.2d at 238). The Court's requirement that there be specific findings supported by evidence is the same as *Bernard's* third condition that there be "procedural safeguards" including evidence and findings, 619 F.2d at 477 (quoting *Southeastern Promotions,* 420 U.S. at 559, 95 S.Ct. at 1246).

The identity between First Amendment standards for reviewing gag orders and the Court's new standards under article I, section 8 is a very remarkable result considering that the Court's opinion calls for "an independent standard under the Texas Constitution." *Ante,* at 11. After all, the two constitutional provisions have different authors, different words, and different histories, and according to the Court, they have been and should be treated separately. Although the Court professes not even to have considered the validity of the gag orders under the First Amendment, the

test it announces for applying the unique and distinctive language of article I, section 8 turns out to be identical to the First Amendment test. This can happen, the Court says: "independent interpretation [does not] necessarily yield a different result". *Ante,* at 22. The Court explains: "Our investigation may reveal federal authority so complete, so well reasoned, and so consistent with the provisions of the Texas Constitution in protecting the individual liberties that we reach the same conclusion." *Id.* It might, of course, but here it does not; that is, the Court rejects the only two federal cases it cites ʾrelating to a test for gag orders as being incomplete, poorly reasoned, and not fully protective of state constitutional free speech rights. The Court has explained how it could reach the same conclusion as federal cases which it considered well-reasoned and authoritative; it has not explained how it could reach the same conclusion as federal cases which it rejects.

If the two constitutional provisions are really as different as the Court insists they are, it is a remarkable coincidence that the standards for applying them to gag orders happen to be identical. But if the standards really are the same, then there is no practical difference in the two provisions, contrary to the Court's insistence. Thus, the Court's analysis strains credulity and finally disproves its own thesis.

### 7

Without reference to the First Amendment, or to the hundreds of cases construing it, this Court attempts to formulate independent standards for applying the guarantee of free speech in article I, section 8 of the Texas Constitution to one form of prior restraints, gag orders like the ones in this case. The task is daunting, even though the law the Court attempts to create on its own is but a small part of what Americans have come to understand as freedom of speech. And in the end the Court fails in its efforts. Barely managing to cobble together a few fragments of history, obvious truisms about the constitutional language, exaggerated claims about its distinctiveness, and phrases taken out of context from a few of our cases, the Court produces a test that is identical to more fully developed First Amendment standards. The Court achieves the very end it sought to avoid—adoption of First Amendment standards—without admitting it.

Why? If state and federal constitutional law conflicted, or if federal law were undeveloped or nonexistent, an effort to expound state law might be productive. But these circumstances are not present here. The Court's effort in this case is like creating a new language in order to write a novel: it is possible to do it, but unnecessary when author and readers already share a common language. And one cannot help being skeptical of an author who claims to have written a book in a new language when the new language sounds a lot like English and the book reads a lot like MOBY DICK.

### C

Most of the Court's opinion today is devoted to a defense of its new method of constitutional analysis which examines the state constitution first, and if a right is found to be protected, never reaches the federal constitutional question. The Court derives this approach from developments in other jurisdictions and our own caselaw. Neither supports the Court's new methodology.

### 1

The Court claims that its new method of constitutional analysis is part of a "trend" that "has met with broad approval" and has been endorsed overwhelmingly by state and federal courts as well as commentators throughout the nation. *Ante,* at 12. These claims are greatly exaggerated. Certainly, there are a number of courts and commentators who have advocated an approach to state courts' decisions of constitutional issues like the one the Court uses today. But the thinking on the subject is not all one way, a fact which the Court attempts to minimize. The truth is that a substantial body of legal commentators disagrees

that an approach like the Court uses is proper or even workable.[10] Most of the cases the Court cites from other jurisdictions are not really as favorable as it suggests.[11] And the Court's assertion that "federal courts have encouraged state courts to embark upon independent analysis of their own constitutions", *ante*, at 15, is not only unsupported by authority but highly improbable. (Why would federal courts take it upon themselves either to encourage or discourage state courts in applying state constitutions?)

As the Court notes, many of the authorities I have cited support judicial reliance upon state constitutions. So do I. Contrary to the Court's assertions, I do not argue that state constitutions should be ignored, or that federal law always controls their construction. I contend only

10. *See* Ronald L. Collins, *Reliance on State Constitutions—Away from a Reactionary Approach*, 9 HASTINGS CONST. L.Q. 1 (1981); George Deukmejian & Clifford K. Thompson, Jr., *All Sail and No Anchor—Judicial Review Under the California Constitution*, 6 HASTINGS CONST. L.Q. 975 (1979); James A. Gardner, *The Failed Discourse of State Constitutionalism*, 90 MICH.L.REV. 761, 764 (1992); Paul S. Hudnut, *State Constitutions and Individual Rights: The Case for Judicial Restraint*, 63 DENVER L.REV. 85, 90–98 (1985); Matthew W. Paul and Jeffrey L. Van Horn, *Heitman v. State: The Question Left Unanswered*, 23 ST. MARY'S L.J. 929, 971–974 (1992); Robert F. Utter, *Swimming in the Jaws of the Crocodile: State Court Comment on Federal Constitutional Issues when Disposing of Cases on State Constitutional Grounds*, 63 TEX.L.REV. 1025, 1027 (1985); Donald E. Wilkes, Jr., *First Things Last: Amendomania and State Bills of Rights*, 54 MISS. L.J. 223, 229 (1984); Robert F. Williams, *State Constitutional Law Processes*, 24 WM. & MARY L.REV. 169, 189–90 (1983); Jeffrey White, Note, *State Constitutional Guarantees as Adequate State Ground: Supreme Court Review and Problems of Federalism*, 13 AM.CRIM.L.REV. 737, 741–749 (1976); *Developments in the Law— The Interpretation of State Constitutional Rights*, 95 HARV.L.REV. 1324, 1331 (1982).

11. The authorities the Court cites do not all support its approach of trying to construe a state constitutional provision without regard to federal law.

*City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 293, 102 S.Ct. 1070, 1076–77, 71 L.Ed.2d 152 (1982), does not hold that the Texas Constitution *does* afford broader protections than the U.S. Constitution, only that it *might:* "the language of the Texas constitutional provision [guaranteeing due course of law and equal protection] is different from, and *arguably* significantly broader than, the language of the corresponding federal provisions" (emphasis added).

Several of the cases cited, some only to separate opinions, expressly consider federal as well as state constitutional law: *Ravin v. State*, 537 P.2d 494, 500, 504 (Alaska 1975); *People v. Brisendine,* 13 Cal.3d 528, 119 Cal.Rptr. 315, 531 P.2d 1099 (1975); *Burrows v. Superior Court of San Bernardino County*, 13 Cal.3d 238, 118 Cal. Rptr. 166, 171, 529 P.2d 590, 595 (1974); *People v. Rolfingsmeyer*, 101 Ill.2d 137, 77 Ill.Dec. 787, 789, 461 N.E.2d 410, 412 (1984); *State v. Hunt*, 91 N.J. 338, 450 A.2d 952, 955 (1982); *O'Neill v. Oakgrove Constr., Inc.*, 71 N.Y.2d 521, 528 N.Y.S.2d 1, 2, 523 N.E.2d 277, 278 (1988) ("Our decision is based on an adequate and independent ground under our State Constitution. Nevertheless, we are noting our agreement with the Federal courts that have reached the same result under the Federal Constitution in order that we might express our own view of the federal guarantee of a free press which, of course, we are also bound to uphold. This practice is in accord with our proper role in helping to expound the Federal, as well as our State, Constitution and, as some of the commentators have explained, it contributes to the development of a body of case law of potential use to federal and other state courts...."); *City of Hillsboro v. Purcell*, 306 Or. 547, 761 P.2d 510, 512–13 (1988); *Commonwealth v. Edmunds*, 526 Pa. 374, 586 A.2d 887, 892–893 (1991); *Farmers New World Life Ins. Co. v. Bountiful City*, 803 P.2d 1241, 1247 (Utah 1990); *State v. Larocco*, 794 P.2d 460, 464–65 (Utah 1990); *State v. Jewett*, 146 Vt. 221, 500 A.2d 233, 235 (1985) ("It would be a serious mistake for this Court to use its state constitution chiefly to evade the impact of the decisions of the United States Supreme Court. Our decisions must be principled, not result-oriented.").

Three cases involved state constitutional provisions without a federal counterpart. *Colorado Civil Rights Comm.*, 759 P.2d 1358, 1363–65 (Colo.1988) (equal rights amendment); *In re T.W.*, 551 So.2d 1186, 1190 (Fla.1989) (express constitutional provision guaranteeing an independent right to privacy); *State v. Beno*, 116 Wis.2d 122, 341 N.W.2d 668, 674–75 (1984) (federal constitutional provision by its express language could not apply to state legislators).

Even Justice Brennan, often credited with founding state constitutionalism theory, does not argue that state courts should ignore the federal constitution. William J. Brennan, Jr., *The Bill of Rights and the States: The Revival of State Constitutions as Guardians of Individual Rights*, 61 N.Y.U.L.REV. 535 (1986).

Stewart G. Pollock, *Adequate and Independent State Grounds as a Means of Balancing the Relationship Between State and Federal Courts*, 63 TEX.L.REV. 977 (1985), describes the method the Court uses but does not indorse it.

that federal constitutional law should be considered when a state constitutional provision is applied. The Court's new analytical method treats the resource of federal law with marked ambivalence. On the one hand, the Court includes federal law among the considerations its new method is to use: "Within the context of such an analysis, a state court can benefit from the insights of well-reasoned and developed federal jurisprudence, but is not compelled to reach identical results." *Ante,* at 13. On the other hand, the Court avoids any useful reference to federal law in this case. The Court *claims* that it "quite obviously" does not disregard federal law, yet it ignores *Bernard* and the United States Supreme Court decisions on which it relies. The Court *says* First Amendment jurisprudence is "not irrelevant", but it also says that it "need not consider whether the United States Constitution has also been violated." *Ante,* at 11. In sum, the Court *says* federal law can be useful in applying the state constitution, but the Court does not use it in this case.

To portray its new methodology in a more favorable light, the Court contrasts it with a misstatement of this opinion:

> Rejecting our careful and detailed analysis of the development and interpretation of article one, section eight, the concurrence advances an alternative— Texas judges should follow, but never lead, federal jurisprudence.... [T]he Texas judge should never diverge from the path taken by the federal judiciary.... [Nothing] should obscure the obligation of adherence to federal authority.

*Ante,* at 21. This, of course, does not even remotely resemble any argument I make here. Federal authority cannot determine state constitutional construction, and I do not argue that it can or should. There may be circumstances in which article I, section 8 applies differently from the First Amendment, but none are present in this case. The Court adopts the same test for gag orders that has already developed in the federal courts, only it refuses to say so. I would simply acknowledge this source of authority and the fact that in this case at least there is no difference in the application of the First Amendment and article I, section 8.

The Court's attempt to focus constitutional analysis on state law to the exclusion of federal law is at odds with itself. If the Court acknowledges that the test for gag orders under federal law is identical to the test it adopts under article I, section 8, it can hardly claim that it has arrived at this test independently. If the Court refuses to acknowledge federal law, then it assumes the difficult task of constructing a state test from almost no precedent, only to arrive at the very conclusion federal law dictates. The Court's approach insists upon looking for differences between the state and federal constitutions when none can be found.

One extensive article surveying the thinking concerning "new federalism" explains some of the deficiencies in the Court's approach:

> Several observers of recent state constitutional activism have argued that state constitutions should be regarded as the primary sources of individual rights and liberties and that state courts should interpret state constitutions without reference to "all the old, familiar shorthand" of federal constitutional law. According to this "primacy" model, the state court should consider assertions of federal constitutional rights only after all claims resting on state law have failed to provide the requested protections. The assumption underlying this model is that the states are the primary sovereigns and that state constitutions are the basic charters of individual liberties and of the limits of governmental authority. In this model, federal law, including the fourteenth amendment, provides only limited constraints on state autonomy.

> The failing of the primacy model is that this assumption no longer resembles reality. Nor does it reflect the fact that litigants typically present state constitutional issues only when they expect an unfavorable federal constitutional result. Federal assumption of the dominant role in the federal system—and particularly

in the protection of individual rights—has rendered the primacy model obsolete. When federal protections are extensive and well articulated, state court decision-making that eschews consideration of, or reliance on, federal doctrine not only will often be an inefficient route to an inevitable result, but also will lack the cogency that a reasoned reaction to the federal view could provide, particularly when parallel federal issues have been exhaustively discussed by the Supreme Court and commentators. In a community that perceives the Supreme Court to be the primary interpreter of constitutional rights, reliance on Supreme Court reasoning can help to legitimate state constitutional decisions that build on the federal base. When a state court diverges from the federal view, a reasoned explanation of the divergence may be necessary if the decision is to command respect.

For state constitutional law to assume a realistic role, state courts must acknowledge the dominance of federal law and focus directly on the gap-filling potential of state constitutions. This interstitial role recognizes federal doctrine as a settled floor of rights and asks whether and how to criticize, amplify, or supplement this doctrine to yield more extensive constitutional protections. The state court's role is not to construct a complete system of fundamental rights from the ground up. [Footnotes omitted.]

*Developments in the Law—The Interpretation of State Constitutional Rights*, 95 HARV.L.REV. at 1356–1358; *see also* Stewart G. Pollack, *State Constitutions as Separate Sources of Fundamental Rights*, 35 RUTGERS L.REV. 707, 718.

It cannot be denied that there are rights protected by state constitutions that extend beyond those guaranteed by the United States Constitution. Many state constitutional provisions simply have no federal analogue. Three of the most important decisions this Court has ever issued were based upon such provisions. *Carrollton–Farmers Branch Indep. Sch. Dist. v. Edgewood Indep. Sch. Dist.*, 826 S.W.2d

489 (Tex.1992); *Edgewood Indep. Sch. Dist. v. Kirby*, 804 S.W.2d 491 (Tex.1991); *Edgewood Indep. Sch. Dist. v. Kirby*, 777 S.W.2d 391 (Tex.1989). In construing state constitutional provisions which have no federal counterpart, reference to federal law is usually of little utility.

When state and federal provisions overlap or correspond, state law, as well as federal law and the law of other states, may be helpful in analyzing their proper application. To ignore all federal constitutional law in construing state constitutional provisions guaranteeing rights common to both is as wrong as ignoring state constitutional provisions altogether. If nothing else, it is inefficient to blaze a trail through the wilderness when there is a perfectly good highway there already, built at considerable expense, and well traveled. But the problems of the Court's method run even deeper. The Court does not merely ignore federal law; it rejects it. And the rejection has a disturbing tone to it. "[O]ur concerns are Texas concerns," the Court asserts, a viewpoint that cannot be very comforting to out-of-state parties litigating in Texas courts.

### 2

The Court's claim that Texas courts have "recognized the importance of our state constitution" for more than a century, *ante*, at 13, cannot be disputed. Certainly, if state courts have not recognized the importance of our state constitution, they should have. This does not mean, of course, that any Texas court has ever employed the constitutional analysis used by the Court today. If the Court's new analytical method had really been followed in Texas for 100 years, as the Court means to suggest, it would hardly need the major defense the Court attempts to provide in this case. Today's opinion is significant only because the Court's methodology has not previously been the accepted model in Texas. In five of the cases the Court cites, we applied provisions of our constitution which have no federal counterpart: *In re Baby McLean*, 725 S.W.2d 696, 698 (Tex. 1987) (article I, section 3a, equal rights

amendment); *LeCroy v. Hanlon,* 713 S.W.2d 335, 341–42 (Tex.1986) (article I, section 13, open courts);[12] *Nelson v. Krusen,* 678 S.W.2d 918, 922 (Tex.1984) (open courts); *Sax v. Votteler,* 648 S.W.2d 661, 664 (Tex.1983) (open courts); *Bell v. Indian Live-Stock Co.,* 11 S.W. 344, 345 (Tex. 1889) (article 16, section 28, protecting current wages for personal service from garnishment). *Travelers' Ins. Co. v. Marshall,* 124 Tex. 45, 76 S.W.2d 1007 (1934), analyzed both state and federal constitutional law, as many other cases from this Court have. *Supra* note 6. In *Tucker,* as we have noted, the Court referred to article I, section 8 and the First Amendment as "like" provisions, and *Hajek* relies entirely on *Tucker.* In *Whitworth v. Bynum,* 699 S.W.2d 194, 197 (Tex.1985), the Court applied state equal protection guarantees to declare our Guest Statute unconstitutional, but drew upon federal principles of analysis. *Foster* was decided by the Court of Criminal Appeals at a time when the First Amendment had not clearly been applied to the states. *Kemper v. State,* 63 Tex.Cr.R. 138 S.W. 1025, 1044–1045 (App.1911), cited by the Court for the proposition that even an opinion of the United States Supreme Court should be questioned by Texas courts if it improperly disregards the rights of Texans, was explicitly overruled on this very point one year later in *Robertson v. State,* 63 Tex.Cr.R. 216, 142 S.W. 533, 546 (App.1912) (holding that the right to confrontation under article I, section 10 of the state constitution shares a common heritage and interpretation with the Sixth Amendment, and deferring to the Supreme Court's interpretation that of right). And *McCormick* and *Heitman v. State,* 815 S.W.2d 681 (Tex.Crim.App.1991), consider both federal and state law in construing constitutional rights. None of the Texas cases the Court cites uses the method it endorses.

The Court's method is especially problematic in a case involving freedom of speech. As one commentator states:

There are good reasons for the state courts to look to federal law for guidance in the first amendment area, an area in which the issues now being addressed are intricate and difficult. The state courts are wrestling with essentially the same questions as the federal courts, and all approach those issues without a clear constitutional mandate. *The states would therefore be foolish to ignore the convenient resource presented by the federal experience;* an argument is no less persuasive because it relies upon or quotes an argument made elsewhere. Commentators who condemn state judiciaries for referring to federal doctrine when interpreting their own charters would force an irrational chauvinism on the state courts.

*Developments in the Law—The Interpretation of State Constitutional Rights,* 95 HARV.L.REV. at 1419 (emphasis added).

3

One argument the Court makes for its new method—avoidance of "unnecessary" federal review—is more subtle and requires more attention. The Court contends that its approach is more efficient because if a case is decided on state constitutional grounds, the United States Supreme Court cannot review it, and thus that Court's workload is reduced and the parties' dispute more quickly resolved. As evidence of the savings to be achieved using its approach, the Court cites a total of four decisions by state courts in the past seventeen years in which review by the United States Supreme Court could have been avoided. Even if it is assumed that all four cases could have been decided on state constitutional grounds unreviewable by the Supreme Court, reducing that Court's workload by four cases in 17 years would not measurably improve its efficiency. Nor do delays in so few cases over so long a period indicate a problem of any magnitude. Efficiency is not a very compelling basis for the Court's argument.

---

**12.** The Court cites *LeCroy* for the proposition that our constitution "has independent vitality." *Ante,* at 11. I fully agree that it does. That observation, however, says nothing about gag orders.

But the Court has more serious reasons for wanting to avoid "unnecessary" federal review. The Court argues that enforcing state constitutional rights both protects values fundamental to the people of that state and commends them to the rest of the nation. The people of a state speak through their state constitution, the argument runs, and that voice should rule in the state and be heard in the nation. This argument, though true in some respects, is mostly a rhetorical appeal to state pride. More importantly, it understates the Court's goal. If a state constitutional provision has no federal counterpart, it must be given effect so long as that can be done without infringing upon the federal constitution. If state and federal constitutional provisions overlap, both must be considered; if they conflict, the state provision must give way. The undeniable fact that the people of a state are entitled to a voice in their government does not mean that the voice of the nation of which the state is a part can be ignored. The goal of the Court's methodology is not merely to augment a state's voice in national affairs, but to still the national voice in state affairs. The approach adopted by the Court is not limited to producing state participation in the national debate over fundamental issues; it seeks state autonomy.

That autonomy, the Court recognizes, is accomplished not by the state constitution itself, but by the *interpretation* of the constitution by the state's highest court. And this brings us to what lies at the very heart of the Court's position: the Justices of this Court, and not the United States Supreme Court, should determine the people's fundamental rights, and if our determinations are unsatisfactory, we can be replaced. By way of illustration, the Court cites *Ex parte Rodriguez*, 39 Tex. 706 (1873), as an unpopular decision resulting in the removal of the Justices of this Court by the Governor. This is the real sense in which federal review is "unnecessary".

There are several difficulties with the Court's position. First, it weakens the validity of constitutionalism and the rule of law. The essence of constitutionalism is that certain principles, endorsed by the people, become fundamental rules of law. How these rules apply in changing circumstances is often disputed, and the judiciary in this country has taken upon itself the ultimate responsibility of resolving those disputes, beginning with *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 2 L.Ed. 60 (1803). The people and the other branches of government have acquiesced in this delegation of responsibility in part, I think, because of their perception that the judiciary is bound in its construction and application of constitutional provisions by definite rules of law which preclude judges from substituting their personal policies for constitutional principles in the guise of construing those principles. Adherence to these rules is essential to the validity and the credibility of constitutionalism. For this reason, constitutional construction must be founded upon a careful construction of each provision's language, purpose, history and intent, as well as upon precedent, theory and fundamental values. If the analytical process is inadequate or flawed, the result may appear to be based primarily on the judge's policy preferences and not the constitutional principle itself. Chief Justice Hughes' observation cannot be avoided altogether: to some extent, at least, the constitution is what the judges say it is. CHARLES EVANS HUGHES, THE SUPREME COURT OF THE UNITED STATES 120 (1928). The statement continues to be true, not because of the *fact* that judges construe constitutions, but because of the *way* in which they do.

The Court decries the prospect that our constitution should "veer in meaning each time the United States Supreme Court issue[s] a new decision", but cites with approval the change in constitutional construction occasioned by the Governor's removal of the justices of this Court following *Rodriguez*. The problem is the same. If a court's constitutional determinations are not in a very real sense mandated by factors distinct from the personal policy views of the justices, constitutionalism is reduced to judicial tyranny. It is no answer to say that "unsatisfactory" constructions of the constitution can be corrected

simply by removing the judges. This is not the way to amend the constitution. And while it might correct the result in particular cases for a time, it leaves the process of constitutionalism itself fatally flawed. Substituting one judge for another in order to change the meaning of the constitution concedes that the constitution has no meaning apart from judges' views. The importance of individual judicial views cannot be denied, but they do not substitute for rules of law. Thus, constitutional construction must not be reduced to the issue of who is doing the construction, "we" or "they". Yet this is the result of the Court's approach, carried to its logical extreme.

The second difficulty with the Court's view that we should define fundamental constitutional rights without interference from outside the state is that it is premised on a one-dimensional view of those rights which is rarely accurate. If relator were constitutionally entitled to say whatever she pleased, this would be an easy case. But her right to speak freely is not absolute, under either the First Amendment or article I, section 8. In this case, relator's right conflicts with the district court's interest in protecting minor litigants, and the issue is whether the district court's interest warrants the restriction imposed on relator's right. This tension among competing rights and interests gives constitutional construction a multi-dimensional aspect. Thus, the Court's view that federal constitutional rights, which states cannot diminish, are a "federal safety net" is overly simplistic. Federal constitutional construction does not merely set minimum standards for protected rights which the states are free to increase; it strikes a balance among competing rights and interests that is itself of constitutional significance. While states may have more latitude in adjusting this balance than they do in reducing guaranteed protections, that latitude is not unlimited. State courts are not free from federal constitutional considerations in determining fundamental rights. The delicate balance among those rights and other interests must also be maintained.

Finally, the we-better-than-they argument evinces an inappropriate chauvinism toward the federal courts and other state courts. The concept of freedom of speech in this country did not originate in any one state, nor does any one court have a monopoly on its application. As it happens, the federal courts have been at construing the First Amendment much longer and far more often than Texas courts have had occasion to consider article I, section 8. The federal courts' experience in defining the contours of freedom of speech ought to be invaluable. To ignore it simply because we can is both imprudent and arrogant.

4

Having reviewed the Court's decision, the basis offered for it, and the defense of its new analytical method, I return to the question posed at the beginning: why should the Court go so far out of its way to invalidate the gag orders in this case on state constitutional grounds? The answer has nothing to do with the result in this case. We are unanimous in our judgment as to the outcome. The answer is not that relator's state and federal constitutional rights are different. So far as this case is concerned, they are identical. The Court's motives are ulterior. One commentator has observed that "some critics have argued that virtually all New Federalism proponents are motivated by the bare desire to achieve a liberal political agenda". Gardner, *supra* note 10, at 772. Whether the agenda is "liberal" or "conservative" or something else altogether makes no difference. The vice is that a non-legal influence has been brought to bear on judicial decision making. This is not "new federalism"; it is "new judicialism". The Court by its opinion today is vulnerable to this charge.

II

Relator complains that she and others have been denied access to court files concerning the pending litigation. She requests that the district court be ordered not to deny her access to these records. There are several affidavits before us, some tending to substantiate relator's posi-

tion and others contradicting it. Our record contains no written order restricting access to court files, and relator does not claim that any such written order exists.

The Court rightly concludes that we cannot resolve factual disputes in a mandamus proceeding and therefore cannot grant relator's request for relief. The Court is not content to leave the matter at that, however, lest any doubt linger as to the result it intends. Thus, it adds that if the district court did restrict access to its files, it abused its discretion and violated TEX. R.CIV.P. 76a; that "there should be no impediment to viewing the court records"; that the district court should make all its records open and available to the public; and that if "[r]elator should find her access to the records in any way obstructed," she may seek additional relief. *Ante*, at 24. This last statement assumes that relator's access to court files has been restricted, contrary to the Court's conclusion that it cannot and has not made that determination. This rather obvious flaw aside, the Court's writing strike me as fairly heavy-handed nudging.

Rule 121(a)(2)(C), TEX.R.APP.P., requires that a certified or sworn copy of the order complained of be attached to a petition for mandamus. No such order is attached to relator's petition in this case, nor, as noted above, is one alleged to exist. If relator believed that her access to court records had been informally restricted by the district court, she should have moved for access, requested a hearing, and either obtained a ruling from the court or a record reflecting the court's refusal to rule. Without a written order or a court's refusal to issue one, this Court should neither issue mandamus nor comment on the merits of relator's complaint.

## III

I agree with the Court that the district court did not abuse its discretion in remov-

ing relator as guardian ad litem of the minor plaintiffs. A guardian ad litem may be appointed for a ward only if the ward's next friend or guardian has an interest adverse to the ward's. TEX.R.CIV.P. 173.[13] A court has no discretion to appoint a guardian ad litem for a person whose next friend or guardian has no such adverse interest, even if the court finds that appointment of a guardian ad litem would be in the person's best interest. Indeed, the next friend or guardian has a right to represent the person without the imposition of a guardian ad litem unless a conflict of interests exists. If the conflict of interest which occasioned the appointment of a guardian ad litem disappears, then it seems to me the guardian ad litem must be removed. It makes little sense that a guardian ad litem cannot be appointed without a conflict of interests between the ward and his next friend or guardian, but may continue to serve after the conflict disappears. *See In re Judicial Settlement of the First Intermediate Account of Proceedings of Manufacturers Hanover Trust Co.*, 83 A.D.2d 808, 442 N.Y.S.2d 7 (1981) (removal of guardian ad litem permissible to save expenses when court determines that the father has no conflict with the minor); *United States v. Noble*, 269 F.Supp. 814, 816 (E.D.N.Y.1967).

The best interest of a ward is sufficient cause for the trial court to replace one guardian ad litem with another. A particular guardian ad litem must be removed or replaced if the ward's best interest requires. *See Barrow v. Durham*, 574 S.W.2d 857, 861 (Tex.Civ.App.—Corpus Christi 1978), *aff'd*, 600 S.W.2d 756 (Tex. 1980) (if guardian's interests are adverse to those of child, then it is abuse of discretion for trial judge not to appoint a new guardian ad litem); *Peters v. Allen*, 296 S.W. 929, 932 (Tex.Civ.App.—San Antonio 1927, no writ) ("if the trial court sees that the ward's interest is not properly protected, it

---

**13.** "When a minor, lunatic, idiot or a non-compos mentis may be a defendant to a suit and has no guardian within this State, or where such person is a party to a suit either as plaintiff, defendant or intervenor and is represented by a next friend or a guardian who appears to the

court to have an interest adverse to such minor, lunatic, idiot or non-compos mentis, the court shall appoint a guardian ad litem for such person and shall allow him a reasonable fee for his services to be taxed as a part of the costs."

is the court's duty to promptly interpose in the ward's behalf to remedy the error, and, if necessary, remove the guardian ad litem and appoint another"); *see also In re Estate of Lacy,* 54 Cal.App.3d 172, 126 Cal. Rptr. 432, 441 (1975) (guardian ad litem who became co-beneficiary of will with minor had adverse interest and should be replaced); *In re Guardianship of Lauderdale,* 15 Wash.App. 321, 549 P.2d 42, 46 (1976) (guardian ad litem cannot represent two minors with conflicting interests). However, the best interests of the ward are not a necessary cause for removal of a guardian ad litem altogether.

The law presumes that it is not in the ward's best interests for a guardian ad litem to supplant an otherwise qualified parent, next friend or guardian. Even if the guardian ad litem were a more effective representative for the ward, the rights of parents, next friends and guardians cannot be set aside in this manner. Furthermore, the service of a guardian ad litem is a burden on the parties to a case. That burden is necessary when the ward's rights cannot legally be served by a parent, next friend or guardian with conflicting interests. The burden is unjustified, however, when those conflicting interests do not exist.

In the present case, the district court determined that no further conflicts of interest exist among the minor plaintiffs and their parents, next friends or guardians who would otherwise represent them in the litigation. The court explicitly stated in its order removing the guardian that because there was "no apparent conflicting or adverse interests between the Next Friends and minors ... the appointment and retention of a Guardian Ad Litem [was] not necessary." All the parties in this latter category have settled their claims in the litigation; only the minors' claims remain. Not only are the parents and others now qualified to represent the minor children, they are entitled to do so without interfer-

ence from a guardian ad litem.[14] Therefore, I agree with the Court that the trial court correctly dismissed the guardian ad litem in this case.

\* \* \* \* \* \*

For these reasons, I concur only in the Court's judgment.

---

14. *Urbish v. 127th Judicial Dist. Court,* 708 S.W.2d 429, 432 (Tex.1986), does not require a different result. In *Urbish* the Court held that the best interests of a child determine which of the divorced parents should represent the child in pending litigation. I agree with the holding in *Urbish,* but consider it inapposite in the present case, where the issue is not which parent will represent the child, but whether the parents or a third party will represent the child.